**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| CalAmp Corp., *et al.*, | Case No. 24-_____ (___) |
| Debtors.[1] | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL**
**ORDERS (I) AUTHORIZING POSTPETITION USE OF CASH COLLATERAL;**
**(II) GRANTING ADEQUATE PROTECTION TO SECURED PARTIES;**
**(III) MODIFYING AUTOMATIC STAY; (IV) SCHEDULING A FINAL**
**HEARING; AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors" and

together with their non-Debtor subsidiaries, the "Company"), in the above-captioned chapter 11

cases (the "Chapter 11 Cases"), hereby file this motion (the "Motion"), pursuant to sections 105,

361, 362, 363, 503, 507(a)(4), and 507(a)(5) of title 11 of the United States Code (the "Bankruptcy

Code"), rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), and rules 2002-1(b), 4001-2, and 9013(m) of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court of the District of

Delaware (the "Local Rules"), for the entry of an interim order, substantially in the form attached

hereto as **Exhibit A** (the "Interim Order"),[2] and a final order (the "Final Order," and together with

the Interim Order, the "Cash Collateral Orders"), (i) authorizing the use of Cash Collateral (as

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: CalAmp Corp. (7070); CalAmp Wireless Networks Corporation (1740); LoJack Global LLC (4794); and Synovia Solutions LLC (2994).  The Debtors' service address is 15635 Alton Parkway, Suite 250, Irvine, CA 92618.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Interim Order or the First Day Declaration (as defined below), as applicable.

defined herein), (ii) granting adequate protection to the Prepetition Secured Parties (as defined herein), (iii) modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Cash Collateral Orders; (iv) scheduling a final hearing (the "Final Hearing") pursuant to Bankruptcy Rules 4001(b) and (d), and (v) granting related relief.  In support of this Motion, the Debtors respectfully represent as follows:

### JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware,* dated February 29, 2012.  This matter is a "core" proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Pursuant to Local Rule 9013-1(f), the Debtors consent to entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith, consistent with Article III of the United States Constitution.

3.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory and legal bases for the relief requested herein are sections 105, 361, 362, 363, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rules 2002-1(b), 4001-2, and 9013-1(m).

IMPAC 11489398v.9

## GENERAL BACKGROUND

### I.    Restructuring Support Agreement and the Chapter 11 Cases

5.    The Debtors have executed the Restructuring Support Agreement dated May 31, 2024 (the "RSA")[3] with the Consenting Lenders, holding 100% of the Secured Term Loan Claims in the principal amount of $45,000,000 and 99.63% of the Secured Note Claims in the principal amount of over $229,000,000.   Prior to the Petition Date, the Debtors solicited the *Joint Prepackaged Chapter 11 Plan of Reorganization of CalAmp Corp. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (as amended, modified, or supplemented, from time to time, (the "Plan"), which incorporates the terms of the RSA and the restructuring transactions contemplated therein.   Also prior to the Petition Date, the Debtors received approval from the only impaired class entitled to vote on the Plan—the Secured Term Loan Claims.

6.    Importantly, the Plan and the RSA contemplate that each of the Debtors' employees, vendors, suppliers, customers, and other trade creditors who have allowed claims will be paid in full and therefore, unimpaired by the Plan.

7.    Moreover, the allowed Secured Note Claims are also unimpaired under the Plan and will receive payment in full in cash with the Consenting Noteholders agreeing to accept lesser treatment under the Plan of 100% of the New Equity Interests on account of their Secured Note Claims.

8.    Finally, to ensure access to liquidity and better cash flow going-forward, the Term Loan Credit Facility will be amended and restated with a lower interest rate and a longer maturity date.   The Secured Term Loan Claims are impaired, entitled to vote, and have already voted in favor of the Plan.

---

[3] A copy of the RSA is attached to the First Day Declaration as Exhibit B.

9. Accordingly, the Debtors filed these Chapter 11 Cases to prosecute the Plan and complete the successful financial restructuring contemplated therein. Upon emergence from these Chapter 11 Cases in short order, the Reorganized Debtors will be a significantly de-levered private company and set up for long-term financial health and success.

10. On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code. The Debtors have also filed a motion requesting joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b). The Debtors are operating their business and managing their properties, as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made, and no official committees have been appointed in these Chapter 11 Cases.

## II. Company Background

11. The Debtors are a connected intelligence company that leverages a data-driven solutions ecosystem to help people and organizations improve operational performance. They solve complex problems for customers within the market verticals of transportation and logistics, commercial and state and local government vehicle fleets, industrial equipment, school district yellow and white fleets, and consumer vehicles by providing solutions that track, monitor, and protect their vital assets and assist with stolen vehicle recovery. The data and insights enabled by the Debtors provides real-time visibility into a user's vehicles, assets, drivers, and cargo, giving organizations a greater understanding and control of their operations. Ultimately, these insights

drive operational visibility, safety, efficiency, maintenance, and sustainability for organizations globally.

12.     The Debtors offer flexible solutions to meet the requirements of varying organizations, business processes, and operational strategies.  One of the key components of the Debtors' business is the CalAmp Telematics Cloud platform (the "CTC").  The CTC is the core engine that enables seamless management of data through a diverse set of assets, from service vehicles to high-value equipment.  The CTC is an enablement platform that connects the Debtors' customers to provide data and insights for a wide range of applications and software services.  This dependable and highly scalable platform seamlessly integrates with the Debtors' edge computing devices to provide customers detailed information and insights via Application Programming Interfaces ("APIs") or software applications built on this platform.

13.     The Debtors also offer a series of telematics edge computing devices that serve as the foundation of their mobile connected ecosystem by collecting data insights from vehicles, drivers, assets, and cargo.  These wireless enabled devices—including asset tracking units, mobile telematics devices, fixed and mobile wireless gateways and routers—underpin the Debtors' wide range of proprietary and third-party software applications and services for business-critical deployments demanding secure and reliable communications and controls anywhere in the world.  The Debtors' customers select products and solutions based on optimized feature sets, programmability, configurability, manageability, long-term support, reliability and, in particular, overall value.

14.     The information captured through the edge computing products and the CTC helps companies more efficiently manage their vital assets including fleet video intelligence, remote asset tracking, real-time crash response and driver behavior scoring, among others.  Customers can

choose to access this information via intuitive purpose-built Software-as-a-Service applications and/or they can programmatically integrate information from the CTC with their own custom in-house applications and workflows using open APIs also offered by the Debtors.  In this way, customers who want a complete turnkey solution can quickly leverage the Debtors' information and insights while those customers wishing to integrate that information into their own applications and processes can also easily do so.

15.     Additional factual background regarding the Debtors, including their business operations, their corporate and capital structure, and the events leading to the filing of these Chapter 11 Cases is set forth in the *Declaration of Jikun Kim in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "<u>First Day Declaration</u>"), which is incorporated herein by reference.

## <u>FACTS RELEVANT TO THIS MOTION</u>

### I.     Prepetition Capital Structure

16.     The Debtors' outstanding funded indebtedness is comprised of obligations incurred by the Debtors under (i) the Secured Term Loan Facility, and (ii) the Secured Notes (each as defined herein).  As summarized in the following chart, as of the Petition Date, the Debtors' capital structure includes approximately $275 million in principal in outstanding prepetition secured debt obligations in the aggregate:

| Debt Facility | Principal Amount Outstanding |
|---|---|
| Term Loan Claims | $45,000,000 |
| Secured Notes Claims | $230,000,000 |
| **Total** | **$275,000,000** |

### A.     Secured Term Loan Facility

17.     Pursuant to that certain credit agreement, dated as of December 15, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time,

the "Secured Term Loan Credit Agreement" and, together with all related security agreements, collateral agreements, pledge agreements, control agreements and guarantees, the "Prepetition Term Documents"), among CalAmp Corp. ("CalAmp"), as the borrower, and Lynrock Lake Master Fund LP ("Lynrock"), as lender (the "Term Loan Secured Party"), the Term Loan Secured Party provided to CalAmp secured term loans (the "Secured Term Loans") in an initial aggregate principal amount of $45,000,000 (the "Secured Term Loan Facility").  The Secured Term Loans are scheduled to mature in December 2027, and bear interest at Term SOFR (as defined in the Secured Term Loan Credit Agreement plus 6.75%).

18.    CalAmp's obligations under the Secured Term Loan Facility are guaranteed by each of CalAmp UK Ltd. ("CalAmp UK"), CalAmp Wireless Networks Corporation ("CalAmp Wireless"), Synovia Solutions, LLC ("Synovia"), Tracker Network (UK) Limited ("Tracker"), LoJack Global LLC ("LoJack Global" and, collectively with  CalAmp UK, CalAmp Wireless, Synovia, Tracker, and LoJack Global, the "Term Loan Guarantors," and the Term Loan Guarantors, together with CalAmp, the "Term Loan Obligors") pursuant to the Prepetition Term Documents.

19.    As of the Petition Date, pursuant to the Prepetition Term Documents, CalAmp and the Term Loan Guarantors were jointly and severally indebted and liable to the Term Loan Secured Party, in the aggregate principal amount of not less than $45,000,000 on account of the Secured Term Loans, *plus* accrued interest, *plus* all other fees, costs, expenses, indemnification obligations, reimbursement obligations, charges, premiums, additional interest, any other Obligations (as defined in the Secured Term Loan Credit Agreement), and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Prepetition Term Documents (collectively, the "Prepetition Term Loan Secured

Obligations").

20.     As of the Petition Date, the Prepetition Term Loan Secured Obligations were secured by valid, binding, non-avoidable, properly perfected and enforceable liens on and security interests (the "Prepetition Term Loan Secured Liens") in the Collateral (as defined in the Prepetition Term Documents, the "Term Loan Collateral").  The Prepetition Term Loan Secured Liens (a) were granted to, or for the benefit of, the Term Loan Secured Party for fair consideration and reasonably equivalent value; (b) are *pari passu* in priority to the Secured Notes Liens (as defined below) on the Secured Notes Collateral (as defined below) pursuant to the Intercreditor Agreement (as defined below); and (c) are senior in priority to any and all other liens on the Term Loan Collateral, except for the senior liens permitted by the Prepetition Term Documents, solely to the extent such senior liens were valid, binding and senior to the Prepetition Term Loan Secured Liens as of the Petition Date or were in existence immediately prior to the Petition Date and were perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b)) (the "Prepetition Term Loan Permitted Liens").

21.     The Prepetition Term Documents contains several provisions concerning events of default, which provide for, among other things, a default upon (i) any failure to timely furnish certain audited consolidated financial statements to the Term Loan Secured Party and (ii) the inclusion of any qualification in such financial statements indicating the Company's inability to continue as a going concern, or any similar qualification, commentary, or exception.

**B.     Secured Notes**

22.     Pursuant to that certain indenture, dated as of July 20, 2018 (as amended and supplemented by that certain Supplemental Indenture, dated as of December 15, 2023, the First Supplemental Indenture, dated as of February 28, 2024, and as further amended, restated, amended and restated, supplemented, restructured or otherwise modified, renewed or replaced from time to

8

time, the "Indenture," together with all related security agreements, collateral agreements, pledge agreements, control agreements and guarantees, the "Prepetition Notes Documents," and, collectively with the Prepetition Term Documents, the "Prepetition Credit Documents") by and among CalAmp, as issuer (the "Issuer"), the Bank of New York Mellon Trust Company, N.A., as trustee and U.S. Collateral Agent (as defined in the Indenture) ("BNYM Trust Company"), The Bank of New York Mellon, as U.K. Collateral Agent (as defined in the Indenture) ("BNYM", collectively with BNYM Trust Company, the "Secured Notes Collateral Agents"), CalAmp issued certain notes (the "Secured Notes"), consisting of claims in a principal amount of $230,000,000 (the "Prepetition Secured Notes" and, together with the Secured Term Loan Facility, the "Prepetition Credit Facilities"), to the noteholders (the "Secured Noteholders" and, collectively with Term Loan Secured Party and the Secured Notes Collateral Agents, the "Prepetition Secured Parties"). As of the Petition Date, Lynrock holds 99.63% of the Secured Notes (Lynrock's interest in the Secured Notes together with the Term Loan Secured Party, the "Required Consenting Lenders").

23.     CalAmp's obligations under the Secured Notes are guaranteed by Tracker, CalAmp UK, LoJack Global, CalAmp Wireless, and Synovia (collectively with Tracker, CalAmp UK, LoJack Global and CalAmp Wireless, the "Secured Notes Guarantors" and, together with the Issuer, the "Secured Notes Obligors") pursuant to the Indenture.

24.     As of the Petition Date, pursuant to the Indenture, the Secured Notes Obligors, including each of the Debtors, were jointly and severally indebted and liable to the Secured Noteholders, in the aggregate principal amount of not less than $230,000,000 on account of the Secured Notes, *plus* accrued interest, *plus* all other fees, costs, expenses, indemnification obligations, reimbursement obligations, charges, premiums, additional interest, and all other

obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the Indenture (collectively, the "Prepetition Secured Notes Obligations," and collectively with the Prepetition Secured Term Loan Obligations, the "Prepetition Secured Obligations").

25.     As of the Petition Date, the Prepetition Secured Notes Obligations were secured by valid, binding, non-avoidable, properly perfected and enforceable liens on and security interests (the "Prepetition Secured Notes Liens," and collectively with the Prepetition Secured Term Loan Liens, the "Prepetition Liens") in the Collateral (as defined in the Prepetition Term Documents, the "Secured Notes Collateral," and collectively with the Term Loan Collateral, the "Prepetition Collateral"). The Prepetition Secured Notes Liens (a) were granted to, or for the benefit of, the Secured Noteholders for fair consideration and reasonably equivalent value; (b) are *pari passu* in priority to the Secured Term Loan Liens on the Term Loan Collateral pursuant to the Intercreditor Agreement; and (c) are senior in priority to any and all other liens on the Secured Notes Collateral, except for the senior liens permitted by the Indenture, solely to the extent such senior liens were valid, binding and senior to the Prepetition Secured Notes Liens as of the Petition Date or were in existence immediately prior to the Petition Date and were either perfected prior to the Petition Date or subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b) (the "Prepetition Secured Notes Permitted Liens," and collectively with the Prepetition Term Loan Permitted Liens, the "Prepetition Permitted Liens," and individually, a "Prepetition Permitted Lien").

26.     The Prepetition Notes Documents contain several provisions concerning events of default, which provide for, among other things, a default upon the occurrence of any event of default under the Prepetition Term Documents. Additionally, the Prepetition Notes Documents

IMPAC 11489398v.9

provide that the delisting from of CalAmp on The NASDAQ Global Market or The Nasdaq Global Select Market (or any of their respective successors) is a Fundamental Change (as defined in the Indenture) and will trigger a redemption right by Secured Noteholders of the Secured Notes. Following the repurchase trigger, the Company is required to send notice of the repurchase option to each Secured Noteholder.  If a Secured Noteholder, upon receiving notice, indicates that it would like to exercise the repurchase option with respect to its share of the Secured Notes, and the Company is unable to satisfy the repurchase obligation in accordance with the terms of the Prepetition Notes Documents, such failure would be considered an event of default under the Indenture.

### C.      The Intercreditor Agreement

27.      The Term Loan Secured Party, the Secured Notes Collateral Agents, CalAmp, CalAmp Wireless, Synovia, CalAmp UK, Tracker, and LoJack Global are parties to that certain First Lien Pari Passu Intercreditor Agreement, dated December 15, 2023 (as amended by that certain Amendment No. 1 and Joinder to First Lien Pari Passu Intercreditor Agreement, dated as of February 28, 2024 (as amended, restated, amended and restated, supplemented and otherwise modified from time to time), the "Intercreditor Agreement"), which governs, among other things, the rights, interests, obligations, priority and positions of the Term Loan Secured Party and the Secured Noteholders.  Pursuant to the Intercreditor Agreement, the liens of the Term Loan Secured Party and the Secured Noteholders granted on the Prepetition Collateral rank *pari passu* with each other.

28.      All of the cash of the Debtors, including cash on deposit or in any account held by the Debtors as of the Petition Date, as well as all cash generated by the collection of the Debtors' accounts receivable, and any proceeds of other disposition of any Prepetition Collateral, constitute

11

Prepetition Collateral and, more specifically, "Cash Collateral" of the applicable Prepetition

Secured Parties within the meaning of Bankruptcy Code section 363(a).

### D.    Letter of Credit

29.    The Debtors also obtained financing pursuant to that certain Revolving Credit and

Security Agreement, dated as of July 13, 2022 (as amended, restated, amended and restated,

supplemented or otherwise modified from time to time, the "PNC Loan Agreement"), by and

among (i) CalAmp, CalAmp Wireless, and Synovia as borrowers, (ii) the financial institutions

from time to time party thereto, and lenders, and (iii) PNC Bank, National Association ("PNC"),

as agent for the lenders.  On December 14, 2023, the Debtors paid off the balance due under the

PNC Loan Agreement.  In addition, the Debtors had a letter of credit (the "LOC") with PNC as

required by a foreign service provider in the amount of $5 million.  The LOC was fully

collateralized at 120% of the LOC amount to secure payment to the foreign payment processor.

PNC required, in connection with the LOC, an amendment to the PNC Loan Agreement dated

May 10, 2024, and entry into that certain Reimbursement Agreement for Standby and Commercial

Letter(s) of Credit, dated May 10, 2024.  The Debtors have switched to a new foreign credit card

payment processor, but there are, and may be trailing charges that the Debtors would be

responsible for, through the LOC.  Accordingly, the Debtors need to keep the LOC in place to

avoid disruption to the Debtors' business operations and the Debtors' obligations under their

agreements with PNC and the foreign payment processor.[4]

---

[4] The Debtors maintain that the LOC and the proceeds therefrom are not property of the estate but have included a description for full disclosure.  *See In re Sabratek Corp.*, 257 B.R. 732, 735 (Bankr. D. Del. 2000) (explaining that letters of credit and their proceeds are not property of the estate).  For the avoidance of doubt, the relief requested in this Motion does not affect the LOC and the proceeds therefrom.

E.    **Unsecured Claims**

30.    As of the Petition Date, the Debtors' unsecured claims are estimated to be about $11.2 million and primarily consist of general trade, professional services, contract counterparty claims, which amount is inclusive of claims that the Debtors may pay in connection with the First Day Motions and contracts to be assumed and cured.

## DEBTORS' PROPOSED USE OF CASH COLLATERAL

31.    "Cash Collateral" as such term is defined in section 363(a) of the Bankruptcy Code,[5] constitutes: all cash held in any Bank Account (as defined in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Perform Intercompany Transactions, and (D) Maintain Existing Business Forms; (II) Authorizing the Debtors' Banks to Honor all Related Payment Requests; and (III) Granting Related Relief* (the "Cash Management Motion"), filed contemporaneously herewith) other than two money market accounts, that hold restricted cash on account of letters of credit, as well as all cash generated by the collection of the Debtors' accounts receivable, and any proceeds of other disposition of any Prepetition Collateral.

32.    In June 2022, the Company engaged Guggenheim Securities LLC ("Guggenheim") as investment banker to evaluate strategic alternatives, including, but not limited to, a sale of substantially all of the Company's assets.  Guggenheim ran a thorough sales marketing process in

---

[5] The Bankruptcy Code defines "cash collateral" as follows:

Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

the summer of 2023, contacting numerous parties and holding various meetings with the Company's management.  The Company, however, received no offers and ultimately terminated Guggenheim's services in February 2024.

33.    In July 2023, the Company engaged Stifel Nicolaus and Company, Incorporated ("Stifel"), an investment bank, to assist in raising debt financing in parallel with the sale marketing process.  Stifel, in conjunction with the Company, contacted numerous debt funding sources to discern whether any had an interest in providing a debt financing offer.  While the Company and Stifel worked on securing debt financing, the Company's financial performance degraded.  Ultimately, the Company only had two options for debt financing, one of which was Lynrock, and Lynrock's debt financing offer was superior to the competing offer.  It offered lower interest rates as well as no restrictive financial covenants.  Due to deteriorating financial conditions, the Company believed it would have triggered the proposed financial covenants contained in the competing debt financing package, causing an immediate or near-immediate default, making that proposal untenable.  Moreover, when the competing potential lender learned of the Company's declining financial performance, it ended discussions with the Company, leaving Lynrock as the only viable option to provide the Company with the necessary liquidity.  The Company negotiated with Lynrock in good faith and at arms-length, leading to an agreement by which Lynrock loaned the Company $45 million under the terms set forth in the Secured Term Loan Credit Agreement.  In connection with Lynrock's proposal, the Indenture was also amended to provide additional guarantees and a security interest with respect to the Secured Notes.  Importantly, Lynrock's proposal provided sufficient liquidity to allow the Company to

continue operating for, at least, the next several years and did not include restrictive financial covenants. Therefore, the Company entered into the Prepetition Term Documents with Lynrock.

34.     In addition to its deteriorating financial performance, and potential delisting from Nasdaq, the Company found itself facing imminent defaults under certain covenants in the Prepetition Term Documents and a consequent cross-default under the Indenture. Specifically, the Company determined that it likely would not be able to timely furnish the appropriate audited consolidated financial statements that do not contain a "going concern" or similar qualification to the Term Loan Secured Party by May 29, 2024, as required under the Secured Term Loan Credit Agreement. The Company also had significant concerns regarding its potential delisting from Nasdaq, which would constitute a Fundamental Change (as defined in the Indenture) and trigger the mandatory repurchase option under the Indenture, likely leading to a subsequent default under the Indenture. Given the foregoing, the Company engaged Advisors (as defined below) and began to discussion potential restructuring alternatives with its key stakeholders, as described in more detail below.

35.     On March 6, 2024, the Debtors retained Oppenheimer & Co. Inc. ("Opco") as financial advisor and investment banker. Since its retention, Opco has been evaluating restructuring alternatives for the Debtors. On April 4, 2024, the Debtors retained Potter Anderson & Corroon LLP ("Potter Anderson" and together with Opco, the "Advisors") as restructuring counsel.

36.     The Debtors, their Advisors, and the Required Consenting Lenders, have been engaged in extensive good faith arms' length negotiations regarding the terms and conditions of a potential reorganization. Through such negotiations, the Company and its Advisors have determined that the best path forward is a chapter 11 restructuring that will result in a debt-for-

equity swap with the Consenting Noteholders under the Plan.  The Debtors and the Consenting Lenders negotiated and executed the RSA on May 31, 2024.  The Debtors have further finalized the Plan and commenced and finalized solicitation of votes in advance of the Petition Date.

37.     In connection with the parties' entry into the RSA, the Consenting Lenders agreed to a forbearance with respect to certain deadlines for the Debtors to provide the Required Consenting Lenders with audited financials. The negotiations also resulted in the terms and conditions of the consensual use of Cash Collateral, culminating in the Interim Order.  The Debtors and the Required Consenting Lenders have also agreed upon a 9-week forecast attached to the Interim Order as **Exhibit 1** (the "Approved Budget"), which includes all reasonable and foreseeable expenses to be incurred by the Debtors for the applicable period.  Without immediate access to Cash Collateral, the Debtors would be forced to shutter operations and dismiss these Chapter 11 Cases, damaging the Debtors' prospects of restructuring the business and confirming the Plan.  Any delay in the Debtors' ability to access Cash Collateral would irreparably harm the Debtors and their estates.  Accordingly, the Debtors respectfully request that the Court authorize the use of Cash Collateral on the terms and conditions set forth in the Cash Collateral Orders.

## **RELIEF REQUESTED**

38.     By this Motion the Debtors seek entry of the Cash Collateral Orders: (i) authorizing the Debtors' use of Cash Collateral, (ii) granting adequate protection to the Prepetition Secured Parties, (iii) modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Cash Collateral Orders; (iv) scheduling the Final Hearing, and (v) granting related relief.

## STATEMENT OF MATERIAL TERMS

39.     Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2(a), the Debtors submit

the following concise statement summarizing the material terms of the Interim Order.[6]

| Material Terms | Summary | Para(s). of the Interim Order |
|---|---|---|
| **Entities with an Interest in Cash Collateral**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(i)* | <u>Term Loan Secured Party</u>: Lynrock Lake Master Fund LP<br><br><u>Secured Noteholders</u>: Lynrock Lake Master Fund LP and other holders of the Secured Notes<br><br><u>Secured Notes Collateral Agents</u>: The Bank of New York Mellon, and The Bank of New York Mellon Trust Company, N.A. | N/A |
| **Purpose for Use of Cash Collateral and Amount of Cash Collateral the Debtors Seek Permission to Use**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(ii)*<br><br>*Local Rule 4001-2(a)(i)*<br><br>*Local Rule 4001-2(a)(i)(A)* | The Debtors seek authority to use Cash Collateral as and to the extent set forth in the Interim Order in accordance with the Approved Budget, subject to permitted variances to, among other things:  (a) provide working capital and funding for general corporate purposes; and (b) pay certain costs of administration of these Chapter 11 Cases, including making payments on account of the Adequate Protection Obligations. | Interim Order, ¶¶ F, 2 |
| **Budget and Variance Reporting**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(ii)*<br><br>*Local Rule 4001-2(a)(i)(E)* | The Approved Budget attached to the Interim Order as <u>Exhibit 1</u> is a 9-week cash flow forecast for the 9-week period commencing on the Petition Date, approved by the Required Consenting Lenders, which reflects on a line-by-line and an aggregate basis, the Debtors' and non-Debtor affiliates' budgeted cash receipts, disbursements and liquidity.<br><br><u>Variance Reports</u>. On the Friday of each calendar week following the Petition Date and for each calendar week thereafter (each, a "<u>Weekly Reporting Date</u>"), by no later than | Interim Order, ¶¶ 3(a)-(c) |

---

[6] Any summary of the terms of the Interim Order contained in this Motion is qualified in its entirety by reference to the provisions of the Interim Order.  To the extent there is a conflict between the Motion and the Interim Order, the Interim Order shall control.  The Debtors reserve the right to supplement the statements made herein.  Capitalized terms used in the summary chart below that are not otherwise defined in this Motion shall have the meaning ascribed to such terms in the Interim Order.

IMPAC 11489398v.9

5:00 p.m. New York City time, the Debtors shall deliver to the Term Loan Secured Party, the Secured Notes Collateral Agents, and the legal and financial advisors to the Prepetition Secured Parties (with such advisors permitted to share with the Prepetition Secured Parties) a variance report, in form and substance reasonably acceptable to the Required Consenting Lenders (each, a "Weekly Variance Report"), setting forth, in reasonable detail:  (i) the actual receipts of the Debtors on a line-by-line and aggregate basis (the "Actual Receipts") and the actual disbursements of the Debtors on a line-by-line and aggregate basis (the "Actual Disbursements"), in each case, during the applicable week ending on the Sunday preceding each such Weekly Reporting Date (each such week, the "Reporting Week"); (ii) a comparison (whether positive or negative, expressed as a percentage) for the Reporting Week between (A) the Actual Receipts (and each line item thereof) for such Reporting Week to the amount of the Debtors' projected receipts (and each line item thereof) set forth in the Approved Budget for such Reporting Week and (B) the Actual Disbursements (and each line item thereof) for such Reporting Week to the amount of the Debtors' projected disbursements (and each line item thereof) set forth in the Approved Budget for such Reporting Week, together with an informational rolling 9-week cash flow forecast.  For the avoidance of doubt, for the week starting from the Petition Date through the last day of such week, the Debtors shall deliver the initial Weekly Variance Report by June 14, 2024, at 5:00 p.m. New York City time.  The initial Weekly Variance Report shall also provide a reasonably detailed explanation for any variance on a line-by-line and an aggregate basis.  Additionally, every fourth Friday following the Petition Date, the Debtors shall provide a variance report, in form and substance reasonably acceptable to the Required Consenting Lenders (each, a "Monthly Variance Report"), comparing the Approved Budget to the (1) the Proposed Updated Budget and (2) the Approved Budget attached to this Interim Order.

Budget Testing.   By no later than 5:00 p.m. (New York City Time) on each Weekly Reporting Date that occurs after the eight-week anniversary of the First Reporting Date, (each such date, a "Rolling Eight-Week Testing Date" and each such subsequent eight-week period ending on the Sunday preceding each such Rolling Eight-Week Testing Date, a "Rolling Eight-Week Testing Period") the Debtors shall provide the Required Consenting Lenders (and their respective advisors) a report, in form and substance reasonably acceptable to the Required Consenting Lenders (a "Rolling Eight-Week Variance Report"

| | | |
|---|---|---|
| | and, together with the Weekly Variance Report, the "Approved Variance Reports"), setting forth in reasonable detail: (i) the aggregate Actual Receipts of the Debtors and aggregate Actual Disbursements of the Debtors, in each case, during the applicable Rolling Eight-Week Testing Period; and (ii) a cumulative comparison (whether positive or negative, expressed as a percentage) between (A) the aggregate Actual Receipts (and each line item thereof) for such Rolling Eight-Week Testing Period to the projected receipts (and each line item thereof) for such Rolling Eight-Week Testing Period set forth in the Approved Budget for such Rolling Eight-Week Testing Period and (B) the aggregate Actual Disbursements (and each line item thereof) for such Rolling Eight-Week Testing Period to the projected disbursements (and each line item thereof) for such Rolling Eight-Week Testing Period set forth in the Approved Budget for such Rolling Eight-Week Testing Period.  During any Eight-Week Rolling Testing Period, the Debtors shall not permit (i) the aggregate Actual Receipts to be less than seventy-five percent (75%) of the projected receipts in the then-in-effect Approved Budget; or (ii) the aggregate Actual Disbursements (excluding the fees and expenses of Retained Professionals (as defined below) and counsel and other advisors to the Prepetition Secured Parties) for the Eight-Week Rolling Testing Period to exceed one-hundred and twenty percent (120%) of the projected disbursements in the then-in-effect Approved Budget (such permitted variances, the "Permitted Variance" and such limitations, the "Variance Covenant"). | |
| **Duration of Use of Cash Collateral/Termination**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(iii)*<br><br>*Local Rule 4001-2(a)(i)(M)* | The Debtors' right to use Cash Collateral shall terminate, without prior order of this Court or any further action by the Prepetition Secured Parties, on the earliest to occur of any of the typical and customary Termination Events set forth in ¶¶ 9(1)-(20) of the Interim Order. | Interim Order, ¶¶ 9(1)-(19). |
| **Fees**<br><br>*Local Rule 4001-2(a)(i)(B)* | As further adequate protection, the Debtors are authorized and directed to pay, without further Court order, (i) the reasonable and documented fees and expenses (the "Adequate Protection Fees"), whether incurred before or after the Petition Date, of the Prepetition Secured Parties, including, without limitation, the reasonable and documented fees and expenses of (A) Akin Gump Strauss Hauer & Feld LLP, as counsel to Lynrock and (B) Pashman, Stein, Walder & Hayden P.C., as counsel to | Interim Order, ¶ 6(f). |

| | | |
|---|---|---|
| | Lynrock, in accordance with the notice and review procedures set forth in paragraph 13(a) of the Interim Order; (ii) to the Term Loan Secured Party, cash payments in an amount equal to the accrued and unpaid interest, whether accruing prior to, on or after the Petition Date, due under the Prepetition Term Documents on account of the Secured Term Loans (calculated at the default contract rate); and (iii) to the Secured Notes Collateral Agents, for the ratable benefit of the Secured Noteholders, cash payments in an amount equal to the accrued and unpaid interest, whether accruing prior to, on or after the Petition Date, due under the Prepetition Notes Documents on account of the Secured Notes (calculated at the default contract rate) (all payments referenced in clauses (i)–(iii) of this paragraph 6(f), the "Adequate Protection Payments"). | |
| **Provisions that Limit the Court's Discretion**<br><br>*Local Rule 4001-2(a)(i)(C)* | Subject to the Carve-Out and any Prepetition Permitted Liens, other than as set forth in the Interim Order, no claim or lien having a priority senior to or *pari passu* with those granted to any of the Prepetition Secured Parties by the Interim Order shall be granted or permitted while any of the Prepetition Secured Obligations remain outstanding.  Except as expressly provided in the Interim Order, each of the Adequate Protection Liens, the Adequate Protection Claims, the Prepetition Liens or the Prepetition Secured Obligations: (i) shall not be junior or subordinated to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any Successor Cases, whether under Bankruptcy Code section 364(d) or otherwise, (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551 or otherwise, (C) any lien arising after the Petition Date including, without limitation, any lien or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors or (D) any intercompany or affiliate lien or claim; and (ii) shall not be subject to Bankruptcy Code sections 510, 549, 550 or 551 and, subject to entry of the Final Order, Bankruptcy Code section 506(c). | Interim Order ¶ 11(a) |
| **Funding of Non-Debtor Affiliates with Cash Collateral**<br><br>*Local Rule 4001-2(a)(i)(D)* | None. | |

IMPAC 11489398v.9

| | | |
|---|---|---|
| **Proposed Adequate Protection, Including Professional Fee Payments**<br><br>*Bankruptcy Rule 4001(b)(1)(B)(iv)*<br><br>*Local Rule 4001-2(a)(ii)*<br><br>*Local Rule 4001-2(a)(ii)(K)* | As adequate protection, the Term Loan Secured Party, and the Secured Notes Collateral Agents (for the benefit of themselves and the Secured Noteholders), are hereby granted the following (collectively, the "<u>Adequate Protection Obligations</u>"):<br><br><u>Term Loan Adequate Protection Liens</u>. To the extent of any Diminution in Value of their interests in the Term Loan Collateral, the Term Loan Secured Party is hereby granted (effective and automatically perfected upon the Petition Date and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements or other agreements), additional and replacement valid, binding, enforceable, non-avoidable, effective and automatically perfected liens on, and security interests in (the "<u>Term Loan Adequate Protection Liens</u>") any and all tangible and intangible pre- and postpetition property of the Debtors, whether existing before, on or arising after the Petition Date, together with any proceeds thereof, including, without limitation, all Prepetition Collateral, any and all cash and any investment of such cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, goods, investment property, documents, instruments, securities, chattel paper, interests in leaseholds, real properties, deposit accounts, securities accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of subsidiaries, wherever located, and the proceeds, products, rents and profits of the foregoing, whether arising under Bankruptcy Code section 552(b) or otherwise, of all the foregoing, excluding causes of action under chapter 5 of the Bankruptcy Code or under any applicable state law ("<u>Avoidance Actions</u>"), but, upon entry of the Final Order, including proceeds of Avoidance Actions (collectively, the "<u>Adequate Protection Collateral</u>"), without the necessity of the execution, recordation or other filing of any security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents.<br><br><u>Secured Notes Adequate Protection Liens</u>. To the extent of any Diminution in Value of their interests in the Secured Notes Collateral, the Secured Notes Collateral Agents (on behalf of the Secured Noteholders) are hereby granted (effective and automatically perfected upon the Petition Date and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing | Interim Order, ¶¶ 6(a)-(f). |

21

statements or other agreements), additional and replacement valid, binding, enforceable, non-avoidable, effective and automatically perfected liens on, and security interests in (the "Secured Notes Adequate Protection Liens" and, together with the Term Loan Adequate Protection Liens, the "Adequate Protection Liens"), the Adequate Protection Collateral solely of the Debtors, without the necessity of the execution, recordation or other filing of any security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents.

Term Loan Adequate Protection Claims. To the extent of any Diminution in Value of their interests in the Prepetition Collateral, the Term Loan Secured Party is hereby granted allowed administrative expense claims against each of the Debtors with the priority set forth in section 507(b) of the Bankruptcy Code (the "Term Loan Adequate Protection Claims"); provided, that, the Term Loan Adequate Protection Claims shall be subject and subordinate to the Carve-Out, provided further, that, the Term Loan Adequate Protection Claims shall be *pari passu* with the Secured Notes Adequate Protection Claims.  The Term Loan Adequate Protection Claims shall be payable from and have recourse to all Adequate Protection Collateral, including, subject only to entry of the Final Order, any proceeds or property recovered in connection with the pursuit of the Avoidance Actions.

Secured Notes Adequate Protection Claims. To the extent of any Diminution in Value of their respective interests in the Prepetition Collateral, the Secured Notes Collateral Agents (for the benefit of themselves and the Secured Noteholders), are hereby granted allowed administrative expense claims against each of the Debtors with the priority set forth in section 507(b) of the Bankruptcy Code (the "Secured Notes Adequate Protection Claims" and, together with the Term Loan Adequate Protection Claims, the "Adequate Protection Claims"); *provided*, that the Secured Notes Adequate Protection Claims shall be subject and subordinate to the Carve-Out, provided further, that, the Secured Notes Adequate Protection Claims shall be *pari passu* with the Term Loan Adequate Protection Claims.  The Secured Notes Adequate Protection Claims shall be payable from and have recourse to all Adequate Protection Collateral at the Debtors, including, subject only to entry of the Final Order, any proceeds or property recovered in connection with the pursuit of the Avoidance Actions.

IMPAC 11489398v.9

| | | |
|---|---|---|
| | <u>Interest, Fees and Expenses</u>. As further adequate protection, the Debtors are authorized and directed to pay, without further Court order, (i) the reasonable and documented fees and expenses (the "<u>Adequate Protection Fees</u>"), whether incurred before or after the Petition Date, of the Prepetition Secured Parties, including, without limitation, the reasonable and documented fees and expenses of (A) Akin Gump Strauss Hauer & Feld LLP, as counsel to Lynrock, and (B) Pashman, Stein, Walder & Hayden P.C., as counsel to Lynrock, in accordance with the notice and review procedures set forth in paragraph 12(a) of the Interim Order; (ii) to the Term Loan Secured Party, cash payments in an amount equal to the accrued and unpaid interest, whether accruing prior to, on or after the Petition Date, due under the Prepetition Term Documents on account of the Secured Term Loans (calculated at the default contract rate); and (iii) to the Secured Notes Collateral Agents, for the ratable benefit of the Secured Noteholders, cash payments in an amount equal to the accrued and unpaid interest, whether accruing prior to, on or after the Petition Date, due under the Prepetition Notes Documents on account of the Secured Notes (calculated at the default contract rate) (all payments referenced in clauses (i)–(iii) of this paragraph 6(f), the "<u>Adequate Protection Payments</u>"). | |
| **Liens on Unencumbered Assets**<br><br>*Local Rule 4001-2(a)(i)(G)* | The Adequate Protection Liens include perfected adequate protection liens upon and security interests in all Prepetition Collateral (as defined in the Interim Order), including, upon entry of the Final Order, proceeds of Avoidance Actions. | Interim Order, ¶¶ 6(a)-(b). |
| **Plan Milestones**<br><br>*Local Rule 4001-2(a)(i)(H)* | The Termination Events in the Interim Order include: the following milestones (the "<u>Milestones</u>") are not met, unless extended or waived by the Required Consenting Lenders:<br><br>(a)  The Petition Date shall occur no later than June 4, 2024.<br><br>(b)  The Interim Cash Collateral Order shall have been entered by no later than 3 business days after the Petition Date, in form and substance acceptable to the Required Consenting Lenders.<br><br>(c)  The Final Cash Collateral Order shall have been entered by no later than 30 days after the Petition Date, in form and substance acceptable to the Required Consenting Lenders. | Interim Order ¶ 9(19) |

| | | |
|---|---|---|
| | (d) The Confirmation Order, in form and substance acceptable to the Company and the Required Consenting Lenders, shall have been entered no later than 45 days after the Petition Date.<br><br>(e) The Plan Effective Date shall have occurred no later than 60 days after the Petition Date, which shall automatically be extended for up to an additional 30 days solely to the extent that all conditions to the occurrence of the Plan Effective Date have been satisfied or waived other than (i) the Regulatory Condition and (ii) those conditions precedent to the Plan Effective Date that by their nature are to be satisfied on the Plan Effective Date. | |
| **Prepayment Penalty**<br><br>*Local Rule 4001-2(a)(i)(I)* | None. | |
| **Provisions Causing Jointly Administered Debtors to Become Jointly and Severally Liable**<br><br>*Local Rule 4001-2(a)(i)(J)* | None (the Debtors are jointly and severally liable on the Prepetition Secured Obligations). | |
| **Provisions Regarding Payment of Lenders' Attorneys Fees Without Notice or Review**<br><br>*Local Rule 4001-2(a)(i)(K)* | None. Paragraph 12 of the Interim Order provides for review by the U.S. Trustee and any committee appointed under section 1102 of the Bankruptcy Code. | |
| **Liens on Chapter 5 Actions**<br><br>*Local Rule 4001-2(a)(i)(U)* | As noted above, subject to entry of the Final Order, the Adequate Protection Liens include adequate protection liens upon and security interests in the proceeds of Avoidance Actions. | Interim Order, ¶¶ 6(a)-(b). |
| **Carve Out**<br><br>*Local Rule 4001-2(a)(i)(F)* | <u>Carve-Out</u>. Notwithstanding anything to the contrary in the Interim Order, the Debtors' obligations to the Prepetition Secured Parties, and the liens, security interests and superpriority claims granted by the Interim Order or under the Prepetition Credit Facilities, and the payment of all such | Interim Order, ¶ 4. |

obligations, shall be subject and subordinate in all respects to payment of the following fees and expenses: (i) all unpaid fees required to be paid to the Clerk of the Court or statutory fees payable to the U.S. Trustee under 28 U.S.C. § 1930, with interest at the statutory rate pursuant to 31 U.S.C. § 3717 (the "Government Fees"), which shall not be limited by any Budget; (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under Bankruptcy Code section 726(b) (the "Chapter 7 Expenses"), (iii) to the extent allowed at any time (whether by interim order, final order, procedural order or otherwise), all unpaid fees and expenses (collectively, the "Professional Fees") incurred by persons or firms retained by the Debtors (the "Debtor Professionals") or any official committee of unsecured creditors appointed in the chapter 11 cases (a "Committee" and such professionals to the Committee, the "Committee Professionals" and together with the Debtor Professionals, the "Retained Professionals") pursuant to Bankruptcy Code section 327, 328, 363 or 1103, as applicable, at any time before or on the first business day following delivery of a Trigger Notice (defined below) and without regard to whether such fees and expenses were invoiced after the Carve-Out Trigger Notice Date, but solely in the amounts set forth in the then-in-effect Approved Budget, whether allowed by the Court prior to or after delivery of the Trigger Notice (the "Pre-Trigger Fees" and such amounts, the "Pre-Trigger Fee Cap"); and (iv) the Professional Fees of (x) Debtor Professionals in an aggregate amount not to exceed $500,000 (the "Debtor Post-Trigger Fee Cap") and (y) Committee Professionals in an aggregate amount not to exceed $100,000 (the "Committee Post-Trigger Fee Cap" and, together with the Debtor Post-Trigger Fee Cap, the "Post-Trigger Fee Cap" and, together with the Pre-Trigger Fee Cap, the "Carve-Out Cap") incurred after the first business day following delivery of a Trigger Notice (as defined herein) (the "Post-Trigger Fees"). Any payment or reimbursement made to any Retained Professionals on or after the delivery of the Trigger Notice shall permanently reduce the Carve-Out on a dollar-for-dollar basis (the foregoing clauses (i) through (iv), collectively, the "Carve-Out").

| | | |
|---|---|---|
| **Provision Prohibiting Use of Estate Funds to Investigate the Liens and Claims of the Prepetition Lender**<br><br>*Local Rule 4001-2(a)(i)(L)* | Subject to Paragraph 14 of the Interim Order, none of the Adequate Protection, Prepetition Collateral (including Cash Collateral) or the Carve-Out may be used: (i) to investigate (except as expressly provided herein), initiate, prosecute, join or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense or other litigation of any type (A) against any of the Prepetition Secured Parties and each of their respective affiliates, officers, directors, employees, agents, representatives, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, any so-called "lender liability" claims and causes of action, or seeking relief that would impair the rights and remedies of the Prepetition Secured Parties under this Interim Order or the Prepetition Credit Documents, as applicable, to the extent permitted or provided hereunder, including, without limitation, for the payment of any services rendered by any Retained Professional in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration or similar relief that would impair the ability of any of the Prepetition Secured Parties to recover on the Prepetition Collateral, or seeking affirmative relief against any of the Prepetition Secured Parties related to the Prepetition Secured Obligations, as applicable, (B) seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the Prepetition Liens or the Prepetition Secured Obligations or (C) for monetary, injunctive or other affirmative relief against any of the Prepetition Secured Parties that would impair the ability of any of the Prepetition Secured Parties to assert or enforce any lien, claim, right or security interest or to realize or recover on the Prepetition Secured Obligations to the extent permitted or provided hereunder; (ii) for objecting to or challenging in any way the legality, validity, priority, perfection or enforceability of the claims, liens or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Secured Obligations; (iii) for asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to the Prepetition Liens or the Prepetition Secured Obligations; or (iv) for prosecuting an | Interim Order ¶ 13 |

| | | |
|---|---|---|
| | objection to, contesting in any manner or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of any of the Prepetition Liens, Prepetition Secured Obligations or any other rights or interests of any of the Prepetition Secured Parties related to the Prepetition Secured Obligations; *provided* that up to $50,000 of the Prepetition Collateral, including Cash Collateral (the "Committee Investigation Budget"), may be used by a Committee appointed in the Debtors' Chapter 11 Cases to investigate the claims and liens of the Prepetition Secured Parties, solely with respect to the Prepetition Secured Obligations and Prepetition Collateral within the Challenge Period. | |
| **Cross Collateralization**<br><br>*Local Rule 4001-2(a)(i)(N)* | None. | |
| **Provisions that Immediately Prime Prepetition Liens without Consent**<br><br>*Local Rule 4001-2(a)(i)(P)* | None. | |
| **Findings Regarding Validity/Perfection Amount**<br><br>*Local Rule 4001-2(a)(i)(Q)* | As set forth in the Interim Order, the Debtors have acknowledged and agreed as set forth therein that the obligations under the Prepetition Credit Documents constitute allowed, legal, valid, binding and non-avoidable obligations. | Interim Order, ¶¶ E(i)(4) & E(ii)(4) |
| **Challenge Period**<br><br>*Local Rule 4001-2(a)(i)(Q)* | The acknowledgments, stipulations, admissions, waivers and releases contained in the Interim Order shall also be binding upon all other parties in interest, including, but not limited to, any Committee, or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "Trustee") and each of their respective successors and assigns, in all circumstances and for all purposes, unless (i) such party, having obtained the requisite standing, timely and properly | Interim Order, ¶ 14(b) |

27

| | | |
|---|---|---|
| | commences and serves an adversary proceeding or contested matter challenging the validity, perfection, priority, extent, or enforceability of the Prepetition Liens or the Prepetition Secured Obligations, or otherwise asserting or prosecuting any other claims, counterclaims or causes of action, objections, contests, or defenses (each, a "<u>Challenge</u>") against the Prepetition Secured Parties in connection with any matter related to the Prepetition Credit Facilities, the Prepetition Collateral, the Prepetition Liens, or the Prepetition Secured Obligations by the date that is no later than the earlier of (i) seventy-five (75) calendar days after entry of the Interim Order or (ii) subject to entry of a Final Order, the commencement of a hearing on the confirmation of the Debtors' plan;  in each case, subject to further written extension (which writing may be in the form of e-mail by counsel) by the Term Loan Secured Party or the Secured Notes Collateral Agents (at the direction of the Required Consenting Lenders), as the case may be (the "<u>Challenge Period</u>"); *provided* that in the event that, prior to the expiration of the Challenge Period, (x) any of these cases is converted to a Successor Case or (y) a chapter 11 trustee is appointed, then, in each such case, the Challenge Period shall be extended for a period of thirty (30) days solely with respect to any Trustee, commencing on the occurrence of either of the events described in the foregoing clauses (x) and (y); and (ii) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the party asserting any Challenge sustaining any Challenge in such duly filed adversary proceeding or contested matters. | |
| **Provisions Modifying or Terminating the Stay Following an Event of Default that Do No require at least Five (5) Days' Written Notice**<br><br>*Local Rule 4001-2(a)(i)(S)* | None. | |
| **Limitations on Arguments at Post-Default Emergency Hearing** | None. | |

IMPAC 11489398v.9

| | | |
|---|---|---|
| *Local Rule 4001-2(a)(i)(T)* | | |
| **506(c) Waiver**<br><br>*Local Rule 4001-2(a)(i)(V)* | Subject to entry of the Final Order, except to the extent of the Carve-Out, no costs or expenses of administration of these Chapter 11 Cases or any Successor Cases at any time, including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the Secured Notes Collateral Agents or the Prepetition Secured Parties, respectively, upon the Prepetition Collateral, shall be charged against or recovered from the Prepetition Collateral, whether pursuant to Bankruptcy Code section 506(c), any other legal or equitable doctrine (including unjust enrichment) or otherwise, without the prior written consent of the Required Consenting Lenders, and no such consent shall be implied, directly or indirectly, from anything contained in the Interim Order (including, without limitation, consent to the Carve-Out or the approval of any budget hereunder) or from any other action, inaction, or acquiescence by any of the Prepetition Secured Parties. | Interim Order, ¶ 18 |
| **552(b) Waiver; No Marshaling**<br><br>*Local Rule 4001-2(a)(i)(W)-(X)* | Subject to entry of the Final Order, in no event shall the Secured Notes Collateral Agents or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Adequate Protection Collateral, Adequate Protection Obligations, Prepetition Collateral or the Prepetition Secured Obligations, and all proceeds shall be received and applied in accordance with the Prepetition Credit Facilities, as the case may be.  Subject to entry of the Final Order, each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of Bankruptcy Code section 552(b), and in no event shall the "equities of the case" exception in Bankruptcy Code section 552(b) apply to the Prepetition Secured Parties or the Prepetition Collateral. | Interim Order, ¶ 19 |
| **Releases**<br><br>*Local Rule 4001-2(a)(ii)* | The Debtors waive, discharge, and release any right to challenge any of the Prepetition Secured Obligations or Prepetition Liens. | Interim Order, ¶ E(iii) |

40.     As explained below and in the First Day Declaration, the Debtors' use of Cash

Collateral is necessary to avoid immediate and irreparable harm; absent consensual use of Cash

Collateral, the Debtors will lose access to necessary liquidity to administer their cases, pay the

IMPAC 11489398v.9

ongoing costs associated with running the Debtors' business, adequately fund the Plan process and bring these Chapter 11 Cases to a successful close, thereby dissipating value to the detriment of their estates and creditors, including the Required Consenting Lenders.  Based on the Debtors' Approved Budget, access to Cash Collateral is necessary to maintain operations in the ordinary course and ensure the viability of the Debtors without significant deterioration to the detriment of all stakeholders.

41.    The Interim Order contains certain customary provisions required by the Required Consenting Lenders, which, as described above, have agreed to forbear with respect to their rights and remedies under the Prepetition Term Documents.  These provisions are necessary to the Debtors' consensual use of cash collateral in these Chapter 11 Cases and include certain provisions related to adequate protection, such as (i) providing for the reasonable and documented fees and expenses of certain restructuring professionals retained by the Required Consenting Lenders; (ii) providing for payments to the Term Loan Secured Party in an amount equal to the accrued and unpaid interest (calculated at the default contract rate) due under the Prepetition Term Documents; and (iii) providing for payments to the Secured Notes Collateral Agents for the ratable benefit of the Secured Noteholders in an amount equal to the accrued and unpaid interest (calculated at the default contract rate) due under the Prepetition Notes Documents (as defined in the Cash Collateral Motion).  The foregoing terms, along with the other provisions of the proposed adequate protection package described in detail herein, are necessary and appropriate, as they are fundamental to the Required Consenting Lenders' agreement to consent to the Debtors' use of Cash Collateral.

42.    The Debtors have determined, in an exercise of their business judgment and following good-faith, arms' length negotiations, that the Required Consenting Lenders would only consent to the Debtors' use of Cash Collateral if the Interim Order included the foregoing

provisions.  Accordingly, the Debtors submit that the terms and conditions of the Interim Order are appropriate under the facts and circumstances of the Chapter 11 Cases.

**BASIS FOR RELIEF**

I.   **The Debtors' Use of Cash Collateral and the Proposed Adequate Protection are Appropriate and Should be Authorized.**

43.     The Debtors' use of property of their estates, including Cash Collateral, is governed by section 363 of the Bankruptcy Code.  Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).

44.     Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral.  11 U.S.C. § 363(e).  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis."); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("The term 'adequate protection' is intended to be a flexible concept."); *In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) (emphasizing that "the varying analyses and results contained in the . . . slew of cases demonstrate that what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco*

31

*Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (*citing* 2 Collier on Bankruptcy ¶ 361.01 [1] at 361-66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding"); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case . . .") (citation and quotation omitted).

45.    The concept of adequate protection is designed to shield a secured creditor from diminution in the value of its interest in collateral during the period of a debtor's use.  *See In re Carbone Cos.*, 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) ("The test is whether the secured party's interest is protected from diminution or decrease as a result of the proposed use of cash collateral."); *see also In re Cont'l Airlines, Inc.*, 154 B.R. 176, 180-81 (Bankr. D. Del. 1993) (holding that adequate protection for use of collateral under section 363 of the Bankruptcy Code is limited to use-based decline in value).

46.    In *Swedeland*, the Third Circuit pointedly noted that the purpose of adequate protection "is to insure that the creditor receives the value for which he bargained prebankruptcy." *In re Swedeland*, 16 F.3d at 564 (quoting *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987)); *see also Shaw Indus., Inc. v. First Nat'l Bank of Pa. (In re Shaw Indus., Inc.)*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003) ("The purpose of providing 'adequate protection' is to insure that a secured creditor receives in value essentially what he bargained for."); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (noting that the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the

value of its collateral during the reorganization process") (citation omitted), *rev'd on other grounds*, 89 B.R. 336 (S.D.N.Y. 1988).

47.     As set forth in the Interim Order and described above, the Debtors propose to provide the Prepetition Secured Parties with adequate protection.  The Debtors respectfully submit that, in light of the circumstances of the Chapter 11 Cases, the proposed adequate protection provided to the Prepetition Secured Parties is appropriate and sufficient to protect the Prepetition Secured Parties from any diminution in value of the Cash Collateral.

48.     The Prepetition Secured Parties' Cash Collateral will be used by the Debtors to (i) continue operating in the ordinary course of business, (ii) pursue a restructuring of the Debtors' businesses consistent with the Restructuring Term Sheet through a plan of reorganization; and (iii) administer these Chapter 11 Cases and otherwise administer the estates.  If the Debtors are unable to use Cash Collateral, they would suffer immediate and irreparable harm.  The Debtors would be unable to run and operate their businesses, administer their estates, pursue a plan of reorganization, and, eventually, come to a successful close of these Chapter 11 Cases, thereby dissipating value to the detriment of their estates, including the Prepetition Secured Parties.

49.     The use of Cash Collateral will therefore protect the Prepetition Secured Parties' security interests by preserving the value of their collateral.  *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (evaluating "whether the value of the debtor's property will increase as a result of the" use of collateral in determining sufficiency of adequate protection); *In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that a debtor's use of cash collateral to pay operating

expenses, thereby "preserv[ing] the base that generates the income stream," provided adequate protection to the secured creditor); *In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) (observing that debtor's use of rents to maintain and operate property "will serve to preserve or enhance the value of the building which, in turn, will protect the collateral covered by [the secured lender's] mortgage").

50.     In light of the foregoing, the Debtors submit that the proposed adequate protection to be provided for the benefit of the Prepetition Secured Parties is necessary and appropriate.

## II.     The Proposed Carve-Out is Reasonable and Appropriate

51.     Any security interests or claims granted as Adequate Protection under the Interim Order are subject to the Carve-Out (as defined in the Interim Order).  Without the Carve-Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which such professionals may be paid in these Chapter 11 Cases may be restricted. *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve-outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties in interest are sorely prejudiced").  The Carve-Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers.  Additionally, the Carve-Out protects against administrative insolvency during the course of these Chapter 11 Cases by ensuring that assets remain for the payment of fees of the Clerk of the Bankruptcy Court or the Office of the United States Trustee

IMPAC 11489398v.9

for the District of Delaware as well as fees of the Debtors' professionals and a statutory committee

of unsecured creditors, if appointed.

### III.   Failure to Obtain Immediate Interim Use of Cash Collateral Would Cause Immediate and Irreparable Harm.

52.    Bankruptcy Rule 4001(b)(2) provides that a final hearing on a motion to use cash

collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than

fourteen (14) days after the service of such motion.  Fed. R. Bankr. P. 4001(b)(2).  However, the

Court is authorized to conduct a preliminary expedited hearing on the Motion and authorize the

Debtors' proposed use of Cash Collateral to the extent necessary to avoid immediate and

irreparable harm to the Debtors' estates.  *Id.*

53.    As described herein, the Debtors have an immediate postpetition need to use Cash

Collateral.  The Debtors simply cannot run and operate their businesses, administer these Chapter

11 Cases, maintain the value of their estates, and pursue confirmation of plan of reorganization

without access to cash.  The Debtors will use cash to, among other things, continue operating in

the ordinary course of business and administer these Chapter 11 Cases.  In short, the access to

sufficient working capital and liquidity through the use of Cash Collateral is vital to preserve and

maintain the value of the Debtors' estates and to come to a successful close of these Chapter 11

Cases.

54.    The Debtors, therefore, seek immediate authority to use the Cash Collateral on an

interim basis and as set forth in this Motion and in the Interim Order to prevent immediate and

irreparable harm to their estates pending the Final Hearing pursuant to Bankruptcy Rule

4001(b)(2).  Accordingly, to the extent that the Debtors require the use of Cash Collateral, the

Debtors respectfully submit that they have satisfied the requirements of Bankruptcy Rule

4001(b)(2) to support an expedited preliminary hearing and immediate Cash Collateral availability on an interim basis.

## IV.    Modification of the Automatic Stay on a Limited Basis is Warranted.

55.    By this Motion, the Debtors are requesting modification of the automatic stay (to the extent applicable) as necessary to, *inter alia*, (i) permit the Debtors to grant the security interests and liens described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens, and (ii) permit the Debtors to make the payments authorized to be made in accordance with the terms of the Cash Collateral Orders.

56.    Accordingly, the Debtors respectfully request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Cash Collateral Orders.

## V.    Request for a Final Hearing.

57.    Pursuant to Bankruptcy Rules 4001(b)(2), the Debtors request that the Court set a date for the Final Hearing and fix the date and time prior to the Final Hearing for parties to file objections to the relief requested by this Motion.

## IMMEDIATE RELIEF IS NECESSARY TO
## AVOID IMMEDIATE AND IRREPARABLE HARM

58.    Bankruptcy Rule 6003 provides that the relief requested in this Motion may be granted if the "relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.  The Third Circuit has interpreted the language "immediate and irreparable harm" in the context of preliminary injunctions.  In that context, courts have instructed that irreparable harm is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.  *See, e.g., Norfolk S. Ry. Co. v. City of Pittsburgh*, 235 Fed. App'x 907, 910 (3d Cir. 2007) (citing *Glasco v. Hills*, 558 F.2d 179, 181 (3d

Cir. 1977)).  Furthermore, the harm must be shown to be actual and imminent, not speculative or

unsubstantiated.  *See, e.g., Acierno v. New Castle County*, 40 F.3d 645, 653-55 (3d Cir. 1994).

The Debtors submit that for the reasons already set forth herein, the relief requested in this Motion

is necessary to avoid immediate and irreparable harm to the Debtors and, accordingly, should be

granted on an interim basis.

### WAIVER OF NOTICE AND STAY UNDER BANKRUPTCY RULE 6004

59.     To the extent that Bankruptcy Rule 6004(a) applies, the Debtors respectfully

request a waiver of such notice requirement in order to successfully implement the foregoing

requested relief.

60.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule

6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than

cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court

orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek

in this Motion is necessary for the Debtors to operate their business without interruption and to

preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive

the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief

sought herein justifies immediate relief.

### NOTICE

61.     The Debtors have provided notice of this Motion to the following parties or their

respective counsel: (a) the Office of the United States Trustee; (b) the holders of the thirty (30)

largest unsecured claims against the Debtors on a consolidated basis; (c) the Term Loan Secured

Party; (d) the Secured Notes Collateral Agents; (e) PNC; (f) all parties that have asserted a lien in

the Debtors' assets; (g) the Internal Revenue Service; (h) the Securities and Exchange

Commission; (i) the United States Attorney's Office for the District of Delaware; and (j) any party

that has requested notice pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first day" relief, within forty-eight (48) hours of the entry of an order with respect to this Motion, the Debtors will serve copies of this Motion and any order entered with respect to this Motion as required by Local Rule 9013-1(m).  The Debtors respectfully submit that, in light of the nature of the relief requested, no further notice is necessary.

## NO PRIOR REQUEST

62.     No previous request for the relief sought herein has been made to this Court or any other court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request entry of the Interim Order, substantially in the form attached hereto as **Exhibit A**, and following notice and the opportunity of parties-in-interest to be heard, the Final Order, granting the relief requested herein and such other and further relief as may be just and proper.

Dated:  June 3, 2024
        Wilmington, Delaware

Respectfully submitted,

*/s/ Aaron H. Stulman*
L. Katherine Good (No. 5101)
Aaron H. Stulman (No. 5807)
Gregory J. Flasser (No. 6154)
**POTTER ANDERSON & CORROON LLP**
1313 North Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile:  (302) 658-1192
Email:  kgood@potteranderson.com
        astulman@potteranderson.com
        gflasser@potteranderson.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## EXHIBIT A

**Interim Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CalAmp Corp., *et al.*, | Case No. 24-_____ (___) |
| Debtors.[1] | (Joint Administration Requested) |
| | **Re: Docket No. __** |

**INTERIM ORDER (I) AUTHORIZING LIMITED USE OF CASH COLLATERAL;
(II) GRANTING ADEQUATE PROTECTION LIENS AND SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS TO PREPETITION SECURED PARTIES;
(III) MODIFYING THE AUTOMATIC STAY; (IV) SCHEDULING
FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "Motion") of CalAmp Corp. ("CalAmp"), and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors") pursuant to sections 105, 361, 362, 363, 503, 506 and 507 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 4001-2 and 9013 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking, among other things:

    (i)    authorization for the Debtors to use Cash Collateral (as defined below) in which the Prepetition Secured Parties (as defined below) have liens or other interests, solely in accordance with the terms and conditions of this interim order (together with all annexes and exhibits hereto, this "Interim Order");

    (ii)    authorization for the Debtors to provide adequate protection to the Prepetition Secured Parties on account of any Diminution in Value of their respective interests in the Prepetition Collateral (each, as defined below);

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: CalAmp Corp. (7070); CalAmp Wireless Networks Corporation (1740); LoJack Global LLC (4794); and Synovia Solutions LLC (2994).  The Debtors' service address is 15635 Alton Parkway, Suite 250, Irvine, CA 92618.

(iii)    modification of the automatic stay imposed by Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms of this Interim Order;

(iv)    a waiver of any applicable stay, providing for immediate effectiveness of the Interim Order;

(v)    waivers of (i) the Debtors' and the estates' rights to surcharge against the Prepetition Collateral or the Adequate Protection Collateral (as defined below) pursuant to the Bankruptcy Code section 506(c), (ii) the "equities of the case" exception under Bankruptcy Code section 552(b) and (iii) the equitable doctrine of marshalling with respect to the Prepetition Collateral and the Adequate Protection Collateral, in each case, subject to entry of the Final Order (but retroactive to the Petition Date);

(vi)    subject to the terms of this Interim Order, authorization for the Prepetition Secured Parties to exercise remedies on the terms described herein upon the occurrence and during the continuance of a Termination Event (as defined below);

(vii)    scheduling a final hearing to consider the relief requested in the Motion on a final basis and entry of an order approving the Motion on a final basis (the "Final Order") and approving the form of notice with respect thereto;

Upon consideration of the relief requested in the Motion, the First Day Declaration and the evidence submitted and arguments of counsel made at the initial hearing on the Motion on June [__], 2024 (the "Interim Hearing"); and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this matter being a core proceeding within the meaning of 28 U.S.C. § 157(b)(2); and venue of this proceeding and the Motion in this district being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and appropriate notice having been given in accordance with Bankruptcy Rules 2002, 4001(b) and (d), and 9014 and all applicable Local Rules; and the Interim Hearing to consider the relief requested in the Motion having been held and concluded; and it appearing that approval of the relief granted by this Interim Order is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the hearing on the relief granted herein on a final basis (the "Final Hearing"; and the relief granted hereby otherwise being fair and reasonable and in the best interests of the Debtors, their

2

estates, and all parties in interest, and essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and after due deliberation and consideration, and good and sufficient cause appearing therefor, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[2]

A.    Petition Date.  On June 3, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court.

B.    Debtors in Possession.  The Debtors continue to administer their business and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.  As of the date hereof, no trustee, examiner or official committee of unsecured creditors has been appointed in these Chapter 11 Cases.

C.    Jurisdiction and Venue.  The Court has jurisdiction over the chapter 11 cases and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This Court's consideration of the matters covered by this Interim Order constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

D.    Notice.  Notice of the Motion and the Interim Hearing and the relief requested in the Motion and granted in this Interim Order has been provided by the Debtors in accordance with Bankruptcy Rules 2002, 4001 and 9014 and Local Rule 4001-2.  Except as set forth herein with respect to the Final Hearing and the Final Order, no further notice of, or hearing on, the relief requested in the Motion is necessary or required.  The Debtors have represented that notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors, whether

---

[2]  The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.

by facsimile, electronic mail, overnight courier or hand delivery, to: (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the thirty (30) largest unsecured claims against the Debtors; (c) Secured Notes Collateral Agents (as defined below); (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; ; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002.

E.  <u>Debtors' Stipulations</u>.  Subject to the limitations contained in Paragraphs 13 and 14 of this Interim Order, the Debtors, on their own behalf and on behalf of their estates, shall be deemed to admit, stipulate, acknowledge and agree as follows:

(i)  *Secured Term Loan Facility*.

(1)  <u>Secured Term Loan Facility</u>.  Pursuant to that certain Credit Agreement, dated as of December 15, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>" and, together with all related security agreements, collateral agreements, pledge agreements, control agreements and guarantees, the "<u>Prepetition Term Documents</u>"), among CalAmp, as the borrower, and Lynrock Lake Master Fund LP ("<u>Lynrock</u>"), as lender (the "<u>Term Loan Secured Party</u>"), the Term Loan Secured Party provided to CalAmp secured term loans (the "<u>Secured Term Loans</u>") in an initial aggregate principal amount of $45,000,000 (the "<u>Secured Term Loan Facility</u>").

(2)  <u>Guarantee Obligations</u>.  CalAmp's obligations under the Secured Term Loan Facility are guaranteed by each of CalAmp UK Ltd. ("<u>CalAmp UK</u>"), CalAmp Wireless Networks Corporation ("<u>CalAmp Wireless</u>"), Synovia Solutions ("<u>Synovia</u>"), Tracker Network (UK) Limited ("<u>Tracker</u>"), LoJack Global LLC ("<u>LoJack Global</u>" and, collectively with CalAmp UK, CalAmp Wireless, Synovia, Tracker, and LoJack Global, the "<u>Term Loan</u>

4

Guarantors," and the Term Loan Guarantors, together with CalAmp, the "Term Loan Obligors")
pursuant to the Prepetition Term Documents.

(3)    Prepetition Obligations.    As of the Petition Date, pursuant to the
Prepetition Term Documents, CalAmp and the Term Loan Guarantors were jointly and severally
indebted and liable, without defense, counterclaim, or offset of any kind, to the Term Loan Secured
Party, in the aggregate principal amount of not less than $45,000,000 on account of the Secured
Term Loans, *plus* accrued interest, *plus* all other fees, costs, expenses, indemnification obligations,
reimbursement obligations, charges, premiums, additional interest, any other Obligations (as
defined in the Credit Agreement), and all other obligations of whatever nature owing, whether or
not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the
Prepetition Term Documents (collectively, the "Prepetition Term Loan Secured Obligations").
The Prepetition Term Loan Secured Obligations constitute legal, valid, binding and non-avoidable
obligations against the Term Loan Obligors, including each of the Debtors, and are not subject to
avoidance, recharacterization, counterclaim, defense, offset, recoupment, subordination, other
claim, cause of action, or other challenge of any kind under the Bankruptcy Code, under applicable
non-bankruptcy law or otherwise.  No payments or transfers made to or for the benefit of (or
obligations incurred to or for the benefit of) the Term Loan Secured Party by or on behalf of any
of the Debtors prior to the Petition Date under or in connection with the Secured Term Loan
Facility shall be subject to avoidance, recharacterization, counterclaim, defense, offset,
subordination, other claim, cause of action or other challenge of any kind or nature under the
Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(4)    Prepetition Term Loan Liens.    As of the Petition Date, the
Prepetition Term Loan Secured Obligations were secured by valid, binding, non-avoidable,

5

properly perfected and enforceable liens on and security interests (the "Prepetition Term Loan Secured Liens") in the Collateral (as defined in the Prepetition Term Documents, the "Term Loan Collateral").  The Prepetition Term Loan Secured Liens (a) were granted to, or for the benefit of, the Term Loan Secured Party for fair consideration and reasonably equivalent value; (b) are *pari passu* in priority to the Secured Notes Liens (as defined below) on the Secured Notes Collateral (as defined below) pursuant to the Intercreditor Agreement (as defined below); and (c) are senior in priority to any and all other liens on the Term Loan Collateral, except for the senior liens permitted by the Prepetition Term Documents, solely to the extent such senior liens were valid, binding and senior to the Prepetition Term Loan Secured Liens as of the Petition Date or were in existence immediately prior to the Petition Date and were perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b)) (the "Prepetition Term Loan Permitted Liens").

(ii)    *Secured Notes*.

(1)    Secured Notes.  Pursuant to that certain Indenture, dated as of July 20, 2018 (as amended and supplemented by that certain Supplemental Indenture, dated as of December 15, 2023, the First Supplemental Indenture, dated as of  February 28, 2024, and as further amended, restated, amended and restated, supplemented, restructured or otherwise modified, renewed or replaced from time to time, the "Indenture," together with all related security agreements, collateral agreements, pledge agreements, control agreements and guarantees, the "Prepetition Notes Documents," and, collectively with the Prepetition Term Documents, the "Prepetition Credit Documents"), by and among CalAmp, as issuer (the "Issuer"), the Bank of New York Mellon Trust Company, N.A., as trustee and U.S. Collateral Agent (as defined in the Indenture) ("BNYM Trust Company"), The Bank of New York Mellon, as U.K. Collateral Agent (as defined in the Indenture) ("BNYM", collectively with BNYM Trust Company, the "Secured

6

Notes Collateral Agents"), CalAmp issued certain notes (the "Secured Notes"), consisting of claims in a principal amount of $230,000,000 (the "Prepetition Secured Notes" and, together with the Secured Term Loan Facility, the "Prepetition Credit Facilities"), to the  noteholders (the "Secured Noteholders" and, collectively with Term Loan Secured Party and the Secured Notes Collateral Agents, the "Prepetition Secured Parties").

(2)     Guarantee Obligations.  CalAmp's obligations under the Secured Notes are guaranteed by Tracker, CalAMP UK, LoJack Global, CalAmp Wireless, and Synovia (collectively with Tracker, CalAmp UK, LoJack Global and CalAmp Wireless, the "Secured Notes Guarantors" and, together with the Issuer, the "Secured Notes Obligors") pursuant to the Indenture.

(3)     Prepetition Obligations.  As of the Petition Date, pursuant to the Indenture, the Secured Notes Obligors, including each of the Debtors, were jointly and severally indebted and liable, without defense, counterclaim, or offset of any kind, to the Secured Noteholders, in the aggregate principal amount of not less than $230,000,000 on account of the Secured Notes, *plus* accrued interest, *plus* all other fees, costs, expenses, indemnification obligations, reimbursement obligations, charges, premiums, additional interest, and all other obligations of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable under the  Indenture (collectively, the "Prepetition Secured Notes Obligations," and collectively with the Prepetition Secured Term Loan Obligations, the "Prepetition Secured Obligations").  The Prepetition Secured Notes Obligations constitute legal, valid, binding and non-avoidable obligations against the Secured Notes Obligors, including each of the Debtors, and are not subject to avoidance, recharacterization, counterclaim, defense, offset, recoupment, subordination, other claim, cause of action, or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  No payments or transfers

7

made to or for the benefit of (or obligations incurred to or for the benefit of) the Secured Noteholders by or on behalf of any of the Debtors prior to the Petition Date under or in connection with the Secured Notes shall be subject to avoidance, recharacterization, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

(4)    <u>Prepetition Secured Notes Liens</u>.    As of the Petition Date, the Prepetition Secured Notes Obligations were secured by valid, binding, non-avoidable, properly perfected and enforceable liens on and security interests (the "<u>Prepetition Secured Notes Liens</u>," and collectively with the Prepetition Secured Term Loan Liens, the "<u>Prepetition Liens</u>") in the Collateral (as defined in the Prepetition Term Documents, the "<u>Secured Notes Collateral</u>," and collectively with the Term Loan Collateral, the "<u>Prepetition Collateral</u>").  The Prepetition Secured Notes Liens (a) were granted to, or for the benefit of, the Secured Noteholders for fair consideration and reasonably equivalent value; (b) are *pari passu* in priority to the Secured Term Loan Liens on the Term Loan Collateral pursuant to the Intercreditor Agreement; and (c) are senior in priority to any and all other liens on the Secured Notes Collateral, except for the senior liens permitted by the Indenture, solely to the extent such senior liens were valid, binding and senior to the Prepetition Secured Notes Liens as of the Petition Date or were in existence immediately prior to the Petition Date and were either perfected prior to the Petition Date or subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b) (the "<u>Prepetition Secured Notes Permitted Liens</u>," and collectively with the Prepetition Term Loan Permitted Liens, the "<u>Prepetition Permitted Liens</u>," and individually, a "<u>Prepetition Permitted Lien</u>").

(iii)    <u>No Defenses</u>. No offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Secured Obligations or

8

Prepetition Liens exist, and no portion of the Prepetition Liens or Prepetition Secured Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law.  The Debtors and their estates have no claims, objections, challenges, causes of action, or choses in action, including claims and causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, and 550, or any other avoidance actions under the Bankruptcy Code whether pursuant to federal law or applicable state law or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon, or related to the Prepetition Credit Documents and/or the transactions contemplated hereunder or thereunder; and the Debtors waive, discharge, and release any right to challenge any of the Prepetition Secured Obligations or Prepetition Liens.

(iv)    Intercreditor Agreement.  The Term Loan Secured Party, the Secured Notes Collateral Agents, CalAmp, CalAmp Wireless, Synovia, CalAmp UK, Tracker, and LoJack Global are parties to that certain First Lien Pari Passu Intercreditor Agreement, dated December 15, 2023 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), which governs, among other things, the rights, interests, obligations, priority and positions of the Term Loan Secured Party and the Secured Noteholders.

(v)    Cash Collateral. All of the cash of the Debtors, including cash on deposit or in any account held by the Debtors as of the Petition Date, as well as all cash generated by the collection of the Debtors' accounts receivable, and any proceeds of other disposition of any Prepetition Collateral, constitute Prepetition Collateral and, more specifically, "Cash Collateral"

9

of the applicable Prepetition Secured Parties within the meaning of Bankruptcy Code section 363(a).

(vi)     <u>Entitlement to Adequate Protection</u>. The Prepetition Secured Parties are entitled, pursuant to Bankruptcy Code sections 105, 361, 362, and 363(e), to adequate protection of their interests in the Prepetition Collateral, including Cash Collateral, to the extent of any postpetition diminution in value of their interests in the Prepetition Collateral resulting from, among other things, (a) subordination of the Prepetition Secured Parties' interests in the Prepetition Collateral to the Carve Out, (b) the use of Cash Collateral during these Chapter 11 Cases, (c) the use, sale or lease of any of the Prepetition Collateral, (d) the imposition of the automatic stay pursuant to Bankruptcy Code section 362(a), and/or (e) for any other reason for which adequate protection may be granted under the Bankruptcy Code ("<u>Diminution in Value</u>").  Based on the Motion, the First Day Declaration, and the record presented to the Court at the Interim Hearing, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral, including the Cash Collateral, are fair and reasonable and reflect the Debtors' prudent business judgment.

(vii)     <u>No Control</u>.  None of the Prepetition Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtors' operations are conducted, or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from this Interim Order or the Prepetition Credit Facilities.

IMPAC 11525542v.9

F.    <u>Findings Regarding the Use of Cash Collateral</u>.

(i)    Good and sufficient cause has been shown for the entry of this Interim Order and for authorizing the Debtors to use Cash Collateral of the Prepetition Secured Parties and for granting adequate protection to the Prepetition Secured Parties.

(ii)    The Debtors have an ongoing and immediate need to continue using Cash Collateral to the extent provided in this Interim Order, in order to, among other things:  (a) provide working capital and funding for general corporate purposes; and (b) pay certain costs of administration of these Chapter 11 Cases, in each case, subject to the terms hereof and solely to the extent provided in the Approved Budget, as subject to Permitted Variances (each as defined below).  The Debtors do not have sufficient sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business and administer these Chapter 11 Cases during the term this Interim Order is in effect without the use of Cash Collateral. Absent relief granted in this Interim Order, the Debtors' estates and their businesses will be irreparably harmed.

(iii)    The requisite percentage of Prepetition Secured Parties under the Prepetition Credit Facilities have consented to the Debtors' limited use of Cash Collateral, on the terms and conditions set forth in this Interim Order, and the terms of the adequate protection provided in this Interim Order are fair and reasonable and provide the Debtors reasonably equivalent value and fair consideration.

(iv)    As a material inducement to the Prepetition Secured Parties to agree to subordinate their Prepetition Liens and Adequate Protection Liens to the Carve-Out and consent to the use of Cash Collateral in accordance with and subject to the Approved Budget (subject to the Permitted Variances) and the terms of this Interim Order, each of the Prepetition Secured

11

Parties is entitled to receive, subject to entry of a Final Order, (a) a waiver of any "equities of the case" exceptions or claims under Bankruptcy Code section 552(b), (b) a waiver of the provisions of Bankruptcy Code section 506(c), and (c) a waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the Prepetition Collateral and the Adequate Protection Collateral.

G.    <u>Good Faith</u>.  The terms of the Debtors' use of Cash Collateral pursuant to this Interim Order have been the subject of extensive negotiations conducted in good faith and at arm's length between the Debtors and the Prepetition Secured Parties and, pursuant to sections 105, 361 and 363 of the Bankruptcy Code, the Prepetition Secured Parties are hereby found to have acted in good faith in connection with the negotiation and entry of this Interim Order, and each is entitled to the protection provided under Bankruptcy Code section 363(m).

H.    <u>Continuation of Prepetition Liens; Prepetition Permitted Liens</u>.  Subject to Paragraphs 13 and 14 of this Interim Order, the Prepetition Liens are continuing liens, and the Prepetition Collateral will continue to be encumbered by such liens.  Nothing herein shall constitute a finding or ruling by this Court that any alleged Prepetition Permitted Lien is valid, senior, enforceable, prior, perfected, or non-avoidable.  Moreover, nothing herein shall prejudice the right of any party in interest, including, but not limited to, any of the Debtors or the Prepetition Secured Parties to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Prepetition Permitted Lien.

I.    <u>Immediate Entry</u>.  Good and sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2).  The use of Cash Collateral (and the other Prepetition Collateral), in accordance with this Interim Order, is necessary to avoid immediate and irreparable harm to the Debtors' estates.

IMPAC 11525542v.9

Based upon the foregoing findings and conclusions and the record before this Court, and after due consideration and good and sufficient cause appearing thereof:

**IT IS HEREBY ORDERED THAT**:

1.      <u>Disposition</u>.  The Motion is granted on an interim basis as set forth herein.  Any objections to the relief requested in the Motion on an interim basis that have not previously been withdrawn, waived, settled, or resolved, and all reservations of rights included therein, are hereby denied and overruled on their merits with prejudice.  The rights of all parties in interest to object to entry of a Final Order are fully reserved.

2.      <u>Use of Cash Collateral</u>.  The Debtors are hereby authorized to use all Cash Collateral solely in accordance with this Interim Order and the Approved Budget (as defined below), as subject to Permitted Variances, including, without limitation, to make payments on account of the Adequate Protection Obligations (as defined below) and other obligations provided for in this Interim Order.  The Debtors are enjoined and prohibited from using the Cash Collateral at any time except on the terms and subject to the conditions of this Interim Order, another order of the Court, or as otherwise agreed to by the Required Consenting Lenders (as defined in that certain Restructuring Support Agreement, dated as of May 31, 2024 (together with all annexes and exhibits thereto, the "<u>Restructuring Support Agreement</u>")), by and among the Debtors and the Consenting Lenders (as defined in the Restructuring Support Agreement), as the case may be.

3.      <u>Approved Budget; Compliance and Reporting</u>.

(a)      Attached to this Interim Order as **<u>Exhibit 1</u>** is a 9-week cash flow forecast for the 9-week period commencing on the Petition Date, approved by the Required Consenting Lenders, which reflects on a line-by-line and an aggregate basis, the Debtors' and non-Debtor affiliates' budgeted cash receipts, disbursements and liquidity (the "<u>Initial Budget</u>," as amended,

13

IMPAC 11525542v.9

replaced, supplemented or otherwise modified from time to time in accordance with the terms of this Interim Order, the "Approved Budget"). Except as otherwise provided herein, the Debtors may only use Cash Collateral to fund payments benefitted by the Carve-Out and otherwise in accordance with the Approved Budget (subject to the Permitted Variances). The Debtors shall deliver an updated budget to the Required Consenting Lenders on the Friday of every fourth week after the Petition Date covering the 9-week period commencing on the first day (which, for the avoidance of doubt, shall be Monday) of each such week, respectively (each, the "Proposed Updated Budget" and, together with the then-applicable Approved Budget, the "Budgets") and shall deliver to the U.S. Trustee and any statutory committee appointed in these Chapter 11 Cases any Approved Budget. A Proposed Updated Budget shall constitute an Approved Budget only if such Proposed Updated Budget is acceptable to the Required Consenting Lenders in their sole discretion, as set forth in writing by the Required Consenting Lenders (with e-mail from professionals acting on behalf of the Required Consenting Lenders to the Debtors' counsel being sufficient). Unless the Debtors receive a written acknowledgement from the Required Consenting Lenders that a Proposed Updated Budget is acceptable to such lenders in their sole discretion, the then most recent Approved Budget shall remain in full force and effect. Each Proposed Updated Budget shall be accompanied by such supporting documentation as reasonably requested by the Required Consenting Lenders. Each Proposed Update Budget shall be prepared in good faith based upon assumptions believed by the advisors to the Debtors to be reasonable.

(b) Variance Reports. On the Friday of each calendar week following the Petition Date and for each calendar week thereafter (each, a "Weekly Reporting Date"), by no later than 5:00 p.m. New York City time, the Debtors shall deliver to the Term Loan Secured Party, the Secured Notes Collateral Agents, and the legal and financial advisors to the Prepetition Secured

14

Parties (with such advisors permitted to share with the Prepetition Secured Parties) a variance report, in form and substance reasonably acceptable to the Required Consenting Lenders (each, a "Weekly Variance Report"), setting forth, in reasonable detail:  (i) the actual receipts of the Debtors on a line-by-line and aggregate basis (the "Actual Receipts") and the actual disbursements of the Debtors on a line-by-line and aggregate basis (the "Actual Disbursements"), in each case, during the applicable week ending on the Sunday preceding each such Weekly Reporting Date (each such week, the "Reporting Week"); (ii) a comparison (whether positive or negative, expressed as a percentage) for the Reporting Week between (A) the Actual Receipts (and each line item thereof) for such Reporting Week to the amount of the Debtors' projected receipts (and each line item thereof) set forth in the Approved Budget for such Reporting Week and (B) the Actual Disbursements (and each line item thereof) for such Reporting Week to the amount of the Debtors' projected disbursements (and each line item thereof) set forth in the Approved Budget for such Reporting Week, together with an informational rolling 9-week cash flow forecast.  For the avoidance of doubt, for the week starting from the Petition Date through the last day of such week, the Debtors shall deliver the initial Weekly Variance Report by June 14, 2024, at 5:00 p.m. New York City time.  The initial Weekly Variance Report shall also provide a reasonably detailed explanation for any variance on a line-by-line and an aggregate basis.  Additionally, every fourth Friday following the Petition Date, the Debtors shall provide a variance report, in form and substance reasonably acceptable to the Required Consenting Lenders (each, a "Monthly Variance Report"), comparing the Approved Budget to the (1) the Proposed Updated Budget and (2) the Approved Budget attached to this Interim Order.

(c)      Budget Testing.  By no later than 5:00 p.m. (New York City Time) on each Weekly Reporting Date that occurs after the eight-week anniversary of the First Reporting Date,

15

(each such date, a "Rolling Eight-Week Testing Date" and each such subsequent eight-week period ending on the Sunday preceding each such Rolling Eight-Week Testing Date, a "Rolling Eight-Week Testing Period") the Debtors shall provide the Required Consenting Lenders (and their respective advisors) a report, in form and substance reasonably acceptable to the Required Consenting Lenders (a "Rolling Eight-Week Variance Report" and, together with the Weekly Variance Report, the "Approved Variance Reports"), setting forth in reasonable detail: (i) the aggregate Actual Receipts of the Debtors and aggregate Actual Disbursements of the Debtors, in each case, during the applicable Rolling Eight-Week Testing Period; and (ii) a cumulative comparison (whether positive or negative, expressed as a percentage) between (A) the aggregate Actual Receipts (and each line item thereof) for such Rolling Eight-Week Testing Period to the projected receipts (and each line item thereof) for such Rolling Eight-Week Testing Period set forth in the Approved Budget for such Rolling Eight-Week Testing Period and (B) the aggregate Actual Disbursements (and each line item thereof) for such Rolling Eight-Week Testing Period to the projected disbursements (and each line item thereof) for such Rolling Eight-Week Testing Period set forth in the Approved Budget for such Rolling Eight-Week Testing Period.  During any Eight-Week Rolling Testing Period, the Debtors shall not permit (i) the aggregate Actual Receipts to be less than seventy-five percent (75%) of the projected receipts in the then-in-effect Approved Budget; or (ii) the aggregate Actual Disbursements (excluding the fees and expenses of Retained Professionals (as defined below) and counsel and other advisors to the Prepetition Secured Parties) for the Eight-Week Rolling Testing Period to exceed one-hundred and twenty percent (120%) of the projected disbursements in the then-in-effect Approved Budget (such permitted variances, the "Permitted Variance" and such limitations, the "Variance Covenant").

16

(d)    <u>Accounts Payable Reports</u>.  The Debtors shall deliver to the respective legal and financial advisors, as applicable, to the Required Consenting Lenders, on or before 5:00 p.m. (prevailing Eastern Time) on Friday of each week (commencing on the Friday of the first full calendar week following the entry of this Interim Order) an accounts payable report providing the current estimate of the Debtors' accrued and unpaid accounts payable, each of which shall be prepared by the financial advisors to the Debtors as of the last day of the prior week or other period then most recently ended.

(e)    Except as otherwise agreed to by the Term Loan Secured Party or the Secured Notes Collateral Agents (acting at the direction of the Required Consenting Noteholders), as the case may be, or as expressly permitted herein, the Debtors' use of the Cash Collateral shall be permitted solely pursuant to the terms of, and in accordance with, the Approved Budget, subject to Permitted Variances.  The Prepetition Secured Parties shall not be directly or indirectly obligated to pay any unpaid expenses incurred or authorized to be incurred pursuant to any Proposed Updated Budget or Approved Budget.  Nothing in any Approved Budget shall constitute an amendment or other modification of the Prepetition Credit Facilities or the lending limits set forth therein.  The consent of the Prepetition Secured Parties to the use of Cash Collateral pursuant to this Interim Order shall not be construed as consent to the use of Cash Collateral after the occurrence of a Termination Event (other than funding the Carve-Out as set forth herein), regardless of whether the aggregate funds shown on the Approved Budget have been expended.

4.    <u>Carve-Out</u>.

(a)    <u>Carve-Out</u>.  Notwithstanding anything to the contrary herein, the Debtors' obligations to the Prepetition Secured Parties, and the liens, security interests and superpriority claims granted by this Interim Order or under the Prepetition Credit Facilities, and the payment of

17

all such obligations, shall be subject and subordinate in all respects to payment of the following fees and expenses: (i) all unpaid fees required to be paid to the Clerk of the Court or statutory fees payable to the U.S. Trustee under 28 U.S.C. § 1930, with interest at the statutory rate pursuant to 31 U.S.C. § 3717 (the "Government Fees"), which shall not be limited by any Budget; (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under Bankruptcy Code section 726(b) (the "Chapter 7 Expenses"), (iii) to the extent allowed at any time (whether by interim order, final order, procedural order or otherwise), all unpaid fees and expenses (collectively, the "Professional Fees") incurred by persons or firms retained by the Debtors (the "Debtor Professionals") or any official committee of unsecured creditors appointed in the chapter 11 cases (a "Committee" and such professionals to the Committee, the "Committee Professionals" and together with the Debtor Professionals, the "Retained Professionals") pursuant to Bankruptcy Code section 327, 328, 363 or 1103, as applicable, at any time before or on the first business day following delivery of a Trigger Notice (defined below) and without regard to whether such fees and expenses were invoiced after the Carve-Out Trigger Notice Date, but solely in the amounts set forth in the then-in-effect Approved Budget, whether allowed by the Court prior to or after delivery of the Trigger Notice (the "Pre-Trigger Fees" and such amounts, the "Pre-Trigger Fee Cap"); and (iv) the Professional Fees of (x) Debtor Professionals in an aggregate amount not to exceed $500,000 (the "Debtor Post-Trigger Fee Cap") and (y) Committee Professionals in an aggregate amount not to exceed $100,000 (the "Committee Post-Trigger Fee Cap" and, together with the Debtor Post-Trigger Fee Cap, the "Post-Trigger Fee Cap" and, together with the Pre-Trigger Fee Cap, the "Carve-Out Cap") incurred after the first business day following delivery of a Trigger Notice (as defined herein) (the "Post-Trigger Fees").  Any payment or reimbursement made to any Retained Professionals on or after the delivery of the Trigger Notice shall permanently

18

reduce the Carve-Out on a dollar-for-dollar basis (the foregoing clauses (i) through (iv), collectively, the "Carve-Out").

(b)    Trigger Notice.  For purposes of the Carve-Out, a "Trigger Notice" is a written notice (which may be given by e-mail) delivered by the Term Loan Secured Party or the Secured Notes Collateral Agents (acting at the direction of the Required Consenting Noteholders), as the case may be, by email to counsel to (i) the Debtors, (ii) any Committee appointed in these Chapter 11 Cases, (iii) any chapter 11 trustee, chapter 7 trustee or examiner appointed in these cases or subsequent chapter 7 cases, and (iv) the U.S. Trustee (collectively, the "Carve-Out Notice Parties"), in each case following the occurrence and during the continuation of a Termination Event (as defined below), subject to any applicable grace period, waiver or forbearance, stating that the Post-Trigger Fee Cap has been invoked.  The term "Carve-Out Trigger Notice Date" shall mean the day on which a Trigger Notice is received by the Debtors. On the Carve-Out Trigger Notice Date, the Trigger Notice shall constitute a demand to the Debtors to transfer cash in an amount equal to the Carve-Out Cap less any amount then held in the Funded Reserve Account (as defined in paragraph 4(c) below).

(c)    Funded Reserve Account.  The Debtors shall be authorized and permitted to establish and maintain as escrow, to be held solely for the benefit of the Retained Professionals, and fund such escrow on a weekly basis the amount of the professional fees for the prior week set forth in the Approved Budget (solely to the extent of the Carve-Out, the "Funded Reserve Account"), to satisfy the Carve-Out.  The Funded Reserve Account shall be funded on a weekly basis (starting on the first Friday following the Petition Date and then on each Friday thereafter, and ending on the date upon which a Carve-Out Trigger Notice is delivered) with the amount for Retained Professionals set forth in the Approved Budget for that week.  After the delivery of a

19

Carve-Out Trigger Notice, notwithstanding anything herein to the contrary, the Debtors shall be authorized to deposit cash on hand into the Funded Reserve Account up to the amount of the Carve-Out Amount.  The funds on deposit in the Funded Reserve Account shall be the sole source available to satisfy the obligations benefiting from the Carve-Out. The Debtors shall disburse funds on deposit in the Funded Reserve Account to satisfy the obligations benefiting from the Carve-Out, and shall be permitted to make such disbursement at any time, including following delivery of a Carve-Out Trigger Notice.

(d)    On the Carve Out Trigger Notice Date, the Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date to fund the Funded Reserve Account up to the Carve-Out Cap, to the extent not already funded, in an amount equal to the then unpaid amounts of (i) the Allowed Professional Fees of Estate-Retained Professionals and (ii) the obligations accrued as of the Carve-Out Trigger Notice Date with respect to clauses (i) and (ii) of the definition of Carve-Out set forth in paragraph 4(a) (the "Additional Carve-Out Obligations"). The Debtors shall use such funds held in the Funded Reserve Account to pay Retained Professional fees as they become allowed and payable pursuant to monthly, interim or final orders from the Court; provided, that the Debtors' obligations to pay the allowed fees and expenses of the Retained Professionals shall not be limited or deemed limited to funds held in the Funded Reserve Account.

(e)    Notwithstanding anything to the contrary herein, following delivery of a Trigger Notice, the Prepetition Secured Parties shall not sweep or foreclose on cash (including cash received as a result of the sale or disposition of any assets) of the Debtors until the Funded Reserve Account has been fully funded as permitted above in an amount equal to all obligations benefiting from the Carve-Out.  Any payment or reimbursement made to any Retained

Professional in respect of any Professional Fees prior to the delivery of the Trigger Notice shall not reduce the Carve-Out.

(f)     The amounts in the Funded Reserve Account shall be available only to satisfy Professional Fees and other amounts included in the Carve-Out until such amounts are paid in full.  Notwithstanding anything to the contrary herein, (i) the failure of the Funded Reserve Account to satisfy in full the amount set forth in the Carve-Out shall not affect the priority of the Carve-Out and (ii) in no way shall the Approved Budget, the Carve-Out, the Pre-Trigger Fee Cap or Post-Trigger Fee Cap be construed as a cap or limitation on the amount of the Professional Fees due and payable by the Debtors or that may be allowed by the Court at any time (whether by interim order, final order, or otherwise).  All funds in the Funded Reserve Account shall be used first to pay all obligations benefitting from the Pre-Trigger Fee Cap, until paid in full, and then obligations benefitting from the Post-Trigger Fee Cap.  Upon payment in full of all obligations benefitting from the Carve-Out, any amounts remaining in the Funded Reserve Account shall revert to the Debtors' estates and constitute Cash Collateral of the Prepetition Secured Parties to be distributed in accordance with the priorities set forth in the Prepetition Credit Documents.

(g)     Payments of Professional Fees from the Funded Reserve Account shall be subject to any terms and conditions of the engagement agreements and appurtenant orders for the employment of each Retained Professional.  The Debtors shall be permitted to pay compensation and reimbursement of expenses incurred prior to the occurrence of a Termination Event or delivery of a Termination Notice to the extent allowed and payable under Bankruptcy Code sections 330 and 331.

(h)     To the extent that professional fees and expenses of the Retained Professionals have been incurred by the Debtors or the Committee at any time before or on the

first business day after delivery of a Trigger Notice but have not yet been allowed by the Court, such professional fees and expenses of the Retained Professionals shall constitute Professional Fees benefiting from the Carve-Out upon their allowance by the Court, whether by interim or final compensation order and whether before or after delivery of the Trigger Notice, and the Funded Reserve Account shall be funded to include such professional fees and expenses.

(i)     For the avoidance of doubt, and notwithstanding anything to the contrary in this Interim Order or in any Prepetition Credit Documents, the Carve-Out shall be senior to all liens and claims securing the Adequate Protection Obligations and the Prepetition Secured Obligations, and any and all other forms of adequate protection, liens or claims securing the Prepetition Secured Obligations.

(j)     <u>Limitation on Responsibility of Secured Parties</u>.  None of the Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or expenses of any Retained Professional incurred in connection with these Chapter 11 Cases or any Successor Cases (as defined below).  Nothing in this Interim Order shall be construed to obligate the Prepetition Secured Parties to pay compensation to, or to reimburse the expenses of, any Retained Professional or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

5.     <u>Payments Free and Clear</u>.  Subject to the Carve-Out and paragraph 14 of this Interim Order, any and all payments or proceeds remitted to the Secured Notes Collateral Agents (on behalf of themselves or the Secured Noteholders) and the Term Loan Secured Party pursuant to the provisions of this Interim Order, the Prepetition Credit Facilities, or any subsequent order

of this Court, shall be irrevocable, received free and clear of any claim, interest, charge, assessment or other liability or encumbrance.

6.    <u>Adequate Protection</u>.  The Prepetition Secured Parties are entitled, pursuant to Bankruptcy Code sections 361, and 363(e), and in consideration of the stipulations and consents set forth herein, to adequate protection of their respective interests in the applicable Prepetition Collateral (including Cash Collateral), to the extent of any Diminution in Value of their interests therein.  As adequate protection, the Term Loan Secured Party, and the Secured Notes Collateral Agents (for the benefit of themselves and the Secured Noteholders), are hereby granted the following (collectively, the "<u>Adequate Protection Obligations</u>"):

(a)    <u>Term Loan Adequate Protection Liens</u>. To the extent of any Diminution in Value of their interests in the Term Loan Collateral, the Term Loan Secured Party is hereby granted (effective and automatically perfected upon the Petition Date and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements or other agreements), additional and replacement valid, binding, enforceable, non-avoidable, effective and automatically perfected liens on, and security interests in (the "<u>Term Loan Adequate Protection Liens</u>") any and all tangible and intangible pre- and postpetition property of the Debtors, whether existing before, on or arising after the Petition Date, together with any proceeds thereof, including, without limitation, all Prepetition Collateral, any and all cash and any investment of such cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, goods, investment property, documents, instruments, securities, chattel paper, interests in leaseholds, real properties, deposit accounts, securities accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital

23

stock of subsidiaries, wherever located, and the proceeds, products, rents and profits of the foregoing, whether arising under Bankruptcy Code section 552(b) or otherwise, of all the foregoing, excluding causes of action under chapter 5 of the Bankruptcy Code or under any applicable state law ("Avoidance Actions"), but, upon entry of the Final Order, including proceeds of Avoidance Actions (collectively, the "Adequate Protection Collateral"), without the necessity of the execution, recordation or other filing of any security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents.

(b)    Secured Notes Adequate Protection Liens. To the extent of any Diminution in Value of their interests in the Secured Notes Collateral, the Secured Notes Collateral Agents (on behalf of the Secured Noteholders) are hereby granted (effective and automatically perfected upon the Petition Date and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements or other agreements), additional and replacement valid, binding, enforceable, non-avoidable, effective and automatically perfected liens on, and security interests in (the "Secured Notes Adequate Protection Liens" and, together with the Term Loan Adequate Protection Liens, the "Adequate Protection Liens"), the Adequate Protection Collateral solely of the Debtors, without the necessity of the execution, recordation or other filing of any security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents.

(c)    Ranking of Liens.    The order of priority on the Adequate Protection Collateral shall be as follows: (a) with respect to Adequate Protection Collateral that is not Prepetition Collateral, (i) the Carve-Out, (ii) liens on such collateral that were valid, binding, properly perfected as of the Petition Date or were in existence immediately prior to the Petition Date and were either perfected prior to the Petition Date or subsequent to the Petition Date as

24

permitted by Bankruptcy Code section 546(b), and (iii) the Adequate Protection Liens, which shall rank *pari passu* with one another, and (b) with respect to Adequate Protection Collateral that is Prepetition Collateral, (i) the Carve-Out, (ii) the Prepetition Permitted Liens, (iii) the Adequate Protections Liens, which shall rank *pari passu* with one another and (iv) the Prepetition Liens.

(d)    Term Loan Adequate Protection Claims. To the extent of any Diminution in Value of their interests in the Prepetition Collateral, the Term Loan Secured Party is hereby granted allowed administrative expense claims against each of the Debtors with the priority set forth in section 507(b) of the Bankruptcy Code (the "Term Loan Adequate Protection Claims"); provided, that, the Term Loan Adequate Protection Claims shall be subject and subordinate to the Carve-Out, provided further, that, the Term Loan Adequate Protection Claims shall be *pari passu* with the Secured Notes Adequate Protection Claims.  The Term Loan Adequate Protection Claims shall be payable from and have recourse to all Adequate Protection Collateral, including, subject only to entry of the Final Order, any proceeds or property recovered in connection with the pursuit of the Avoidance Actions.

(e)    Secured Notes Adequate Protection Claims. To the extent of any Diminution in Value of their respective interests in the Prepetition Collateral, the Secured Notes Collateral Agents (for the benefit of themselves and the Secured Noteholders), are hereby granted allowed administrative expense claims against each of the Debtors with the priority set forth in section 507(b) of the Bankruptcy Code (the "Secured Notes Adequate Protection Claims" and, together with the Term Loan Adequate Protection Claims, the "Adequate Protection Claims"); *provided*, that the Secured Notes Adequate Protection Claims shall be subject and subordinate to the Carve-Out, provided further, that, the Secured Notes Adequate Protection Claims shall be *pari passu* with the Term Loan Adequate Protection Claims.  The Secured Notes Adequate Protection

25

Claims shall be payable from and have recourse to all Adequate Protection Collateral at the Debtors, including, subject only to entry of the Final Order, any proceeds or property recovered in connection with the pursuit of the Avoidance Actions.

(f)     <u>Interest, Fees and Expenses</u>. As further adequate protection, the Debtors are authorized and directed to pay, without further Court order, (i) the reasonable and documented fees and expenses (the "<u>Adequate Protection Fees</u>"), whether incurred before or after the Petition Date, of the Prepetition Secured Parties, including, without limitation, the reasonable and documented fees and expenses of counsel to the Required Consenting Lenders (A) Akin Gump Strauss Hauer & Feld LLP, and (B) Pashman, Stein, Walder & Hayden P.C., in accordance with the notice and review procedures set forth in paragraph 12(a) of this Interim Order; (ii) to the Term Loan Secured Party, cash payments in an amount equal to the accrued and unpaid interest, whether accruing prior to, on or after the Petition Date, due under the Prepetition Term Documents on account of the Secured Term Loans (calculated at the default contract rate); and (iii) to the Secured Notes Collateral Agents, for the ratable benefit of the Secured Noteholders, cash payments in an amount equal to the accrued and unpaid interest, whether accruing prior to, on or after the Petition Date, due under the Prepetition Notes Documents on account of the Secured Notes (calculated at the default contract rate) (all payments referenced in clauses (i)–(iii) of this paragraph 6(f), the "<u>Adequate Protection Payments</u>").

7.     <u>Right to Seek Additional Adequate Protection</u>.   This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of any of the Prepetition Secured Parties to request further or alternative forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request.  Subject to the Carve Out, nothing herein shall impair or modify the application of Bankruptcy Code section 507(b) in

26

the event that the adequate protection provided to the Prepetition Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the chapter 11 cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition Secured Parties against any Diminution in Value of their respective interests in the Prepetition Collateral (including the Cash Collateral).  For the avoidance of doubt, the payment of adequate protection payments pursuant to paragraph 6 of this Interim Order shall be without prejudice to (a) the rights of any of the Prepetition Secured Parties to assert claims for payment of any premiums or similar amount set forth in the Prepetition Credit Documents, as applicable, and the rights of the Debtors, the Committee (if any), or any other party in interest to object to or otherwise contest such claims, and (b) the rights of the Debtors, the Committee (if any), or any other party in interest to seek a determination that all or a portion of the Adequate Protection Payments made to the Secured Noteholders should be recharacterized or reallocated under Bankruptcy Code section 506(b) or any other applicable law as payment on account of the Prepetition Secured Notes, which are fully reserved.

8.      Perfection of Adequate Protection Liens.

(a)      The Term Loan Secured Party and the Secured Notes Collateral Agents (on behalf of themselves and the Secured Noteholders), are hereby authorized, but not required, to execute in the name of the applicable Debtors, as their true and lawful attorneys, with full power of substitution (to the maximum extent permitted by law) and to file or record any financing statements, intellectual property filings, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the

27

Adequate Protection Liens.  Whether or not the Term Loan Secured Party or the Secured Notes Collateral Agents, in their sole discretion, choose to file or record any such financing instruments, and subject to paragraph 14 herein and the entry of the Final Order, the Adequate Protection Liens shall be deemed valid, automatically perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Interim Order.  Upon the request of either the Term Loan Secured Party or the Secured Notes Collateral Agents (acting at the direction of the Required Consenting Noteholders), the Debtors, without any further consent of any party, are authorized to take, execute, deliver, and file such instruments (in the case of the Prepetition Secured Parties, without representation or warranty of any kind) to enable the Term Loan Secured Party or the Secured Notes Collateral Agents, as the case may be, to further validate, perfect, preserve and enforce the Adequate Protection Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)    A certified copy of this Interim Order may, in the discretion of the Term Loan Secured Party or the Secured Notes Collateral Agents (acting at the direction of the Required Consenting Noteholders), be filed with or recorded in the filing or recording offices in addition to or in lieu of any financing statements, mortgages, notices of lien or similar instruments, and all filing or recording offices are hereby authorized to accept such copy of this Interim Order for filing or recording.

(c)    Subject to entry of a Final Order, any provision of any lease, license, contract or other agreement that requires (i) the consent or approval of one or more third party or (ii) the payment of any fees or incurrence of obligations, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any the Debtors' interests in any lease, license, or other agreement, or the proceeds thereof, or other collateral related thereto in connection with the

28

granting of the Adequate Protection Liens, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code.  Thereupon, any such provision shall have no force and effect with respect to the granting of the Adequate Protection Liens on the Debtors' interests in any lease, license, or other agreement or the proceeds of any assignment, and/or sale thereof by any Debtor in accordance with the terms of this Interim Order.

9.      Termination Events.  Unless a Termination Event is waived by the Term Loan Secured Party or the Secured Notes Collateral Agents (acting at the direction of the Required Consenting Noteholders), as the case may be, in writing, subject to the applicable notice periods and other terms set forth in Paragraph 10 below, the Debtors' right to use Cash Collateral shall terminate, without prior order of this Court or any further action by the Prepetition Secured Parties, on the earliest to occur of any of the following (each, a "Termination Event"):

(1)      the Debtors' failure to comply with any material provision of this Interim Order and such failure to comply (if curable) shall not have been cured within three (3) business days following provision of written notice (which may be given by e-mail) of such failure from the Term Loan Secured Party or the Secured Notes Collateral Agents (acting at the direction of the Required Consenting Noteholders), as the case may be;

(2)      the Debtors shall have breached the Variance Covenant for any Eight-Week Rolling Testing Period with respect to an Approved Budget;

(3)      the failure of the Debtors to make any payment due under this Interim Order within five (5) business days after such payment becomes due;

(4)      the date of the Debtors' filing of an application, motion, or other pleading seeking to amend, modify, reverse, revoke, stay, rescind, vacate, supplement, or extend this Interim Order without the prior written consent of the Required Consenting Lenders;

29

(5)        this Interim Order ceases, for any reason to be in full force and effect;

(6)        the Court shall have entered an order amending, reversing, revoking, staying, rescinding, vacating, supplementing, extending, or otherwise modifying this Interim Order without the consent of the Required Consenting Lenders, or allowing the use of Prepetition Collateral or Adequate Protection Collateral on any terms other than as set forth in this Interim Order without the consent of the Required Consenting Lenders;

(7)        any Debtor files any application, motion, or other pleading (or solicits, supports, or encourages any other party to file any application, motion, or other pleading) seeking approval of debtor in possession financing without the consent of the Required Consenting Lenders, or the entry of an order approving debtor in possession financing for the Debtors without the consent of the Required Consenting Lenders;

(8)        the entry of any postpetition judgment against the Debtors in excess of $250,000;

(9)        except with respect to applications for the payment of fees of Retained Professionals, any Debtor files any application, motion, or other pleading (or solicits, supports, or encourages any other party to file any application, motion, or other pleading) for the approval of any superpriority claim or any lien that is *pari passu* with or senior to the Adequate Protection Claims, the Adequate Protection Liens, the Prepetition Liens or the Prepetition Secured Obligations without the prior written consent of the Required Consenting Lenders;

(10)      the date any of the Debtors or any affiliate of the Debtors files any pleading or commences any action against any Prepetition Secured Party (i) challenging the validity, priority or enforceability of any of the Adequate Protection Obligations, the Prepetition

30

Secured Obligations or any of the Prepetition Liens (ii) seeking to avoid, disallow, subordinate, or recharacterize any claim, lien, or interest held by any of the Prepetition Secured Parties arising under or related to any of the Prepetition Secured Obligations or (iii) seeking relief under Bankruptcy Code sections 506(c) or 552 with respect to any Adequate Protection Collateral or Prepetition Collateral, including Cash Collateral, or against any of the Prepetition Secured Parties;

(11)    the date any court enters an order dismissing these Chapter 11 Cases, converting these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code (each, a "Successor Case"), appointing a chapter 11 trustee in any of these Chapter 11 Cases, or an examiner with expanded powers relating to the operation of the Debtors or administration of any of these Chapter 11 Cases, or terminates the Debtors' exclusive periods under Bankruptcy Code section 1121, unless, in each case, consented to in writing by the Required Consenting Lenders;

(12)    the Court has entered an order granting relief from the automatic stay in order to permit any party to proceed against any Prepetition Collateral or Adequate Protection Collateral with a fair market value in excess of $500,000;

(13)    the entry of a subsequent order of the Court (i) terminating the Debtors' use of Cash Collateral or (ii) authorizing the use of Cash Collateral without the consent of the Required Consenting Lenders;

(14)    the failure by the Debtors to deliver to the Prepetition Secured Parties and their respective advisors, any of the documents or other information required to be delivered to such parties pursuant to this Interim Order when due, or any such documents or other information shall contain a known material misrepresentation that is not cured within five (5) business days of receipt by the Debtors of written notice (with may be given by e-mail) from any Prepetition Secured Party of such failure or misrepresentation;

31

(15)    the entry of an order by the Court in favor of the Committee (if any), any ad hoc committee or any other party in interest, (a) granting such party standing to pursue any claims against the Prepetition Secured Parties, (b) sustaining an objection to claims of the Prepetition Secured Parties or (c) avoiding any liens held by the Prepetition Secured Parties, *provided*, that the foregoing shall not be deemed to prohibit the investigation by the Committee of any such claims or liens in respect of the Prepetition Secured Obligations in accordance with the terms of this Interim Order;

(16)    the Restructuring Support Agreement shall have been terminated in accordance with its terms as to the Debtors or the Required Consenting Lenders;

(17)    the termination of any of the Debtors' exclusive right to propose a plan of reorganization under chapter 11 of the Bankruptcy Code;

(18)    without the prior written consent of the Required Consenting Lenders, the filing with the Court of a motion seeking approval of a sale under Bankruptcy Code section 363 or a plan of reorganization or liquidation in any of the Chapter 11 Cases that, in either case, does not provide for indefeasible payment in full in cash of all Prepetition Secured Obligations upon closing of such sale or the effective date of such plan;

(19)    the following milestones (the "<u>Milestones</u>") are not met, unless extended or waived by the Required Consenting Lenders:[3]

(i)    The Petition Date shall occur no later than June 4, 2024;

---

[3]  Capitalized terms used but not defined in this paragraph 9 shall have the meanings ascribed to them in the Restructuring Support Agreement.

IMPAC 11525542v.9

(ii)     The Interim Cash Collateral Order shall have been entered by no later than 3 business days after the Petition Date, in form and substance acceptable to the Required Consenting Lenders;

(iii)     The Final Cash Collateral Order shall have been entered by no later than 30 days after the Petition Date, in form and substance acceptable to the Required Consenting Lenders;

(iv)     The Confirmation Order, in form and substance acceptable to the Company and the Required Consenting Lenders, shall have been entered no later than 45 days after the Petition Date; and

(v)     The Plan Effective Date shall have occurred no later than 60 days after the Petition Date, which shall automatically be extended for up to an additional 30 days solely to the extent that all conditions to the occurrence of the Plan Effective Date have been satisfied or waived other than (i) the Regulatory Condition and (ii) those conditions precedent to the Plan Effective Date that by their nature are to be satisfied on the Plan Effective Date.

10.     <u>Remedies Upon a Termination Event</u>.  The Debtors shall provide notice (which may be given by e-mail) to counsel to the Required Consenting Lenders, counsel to the Secured Notes Collateral Agent, counsel to any statutory committee appointed in these Chapter 11 Cases, and the U.S. Trustee immediately upon knowledge of the occurrence of any Termination Event. Upon the occurrence of a Termination Event, the Prepetition Secured Parties shall be entitled to give written notice (which may be given by e-mail) to counsel to the Debtors, the U.S. Trustee and counsel to the Committee, if any, of the termination, reduction or restriction on the ability of the Debtors to use any Cash Collateral (any such declaration made by the Prepetition Secured Parties,

33

an "Enforcement Notice").  During the two (2) business day period following delivery of an Enforcement Notice, the Debtors shall be entitled to use Cash Collateral solely to fund payroll and pay other expenses critical to the operation of the business of the Debtors, subject to the Approved Budget, and, following such two (2) business day period, the Debtors' authorization to use Cash Collateral shall terminate entirely, in each case, unless and to the extent otherwise consented to in writing by the Required Consenting Lenders, in their discretion (which consent may be given by e-mail).  Five (5) calendar days following the delivery of an Enforcement Notice (the "Enforcement Notice Period") the Prepetition Secured Parties may, without further notice or order of the Court, seek to exercise any rights and remedies available to them under the Prepetition Credit Facilities, this Interim Order or applicable law, subject to the Carve-Out and any Prepetition Permitted Liens (and the automatic stay shall be automatically terminated at the end of the Enforcement Notice Period to allow them to do so, unless the Court orders otherwise).  The Debtors and any party in interest shall be entitled to seek an emergency hearing during the Enforcement Notice Period, or such other time as this Court can schedule the hearing in accordance with the Local Rules; *provided*, that if a hearing to consider the foregoing is requested to be heard before the end of the Enforcement Notice Period but is scheduled for a later date by the Court, the Enforcement Notice Period shall be automatically extended to the date of such hearing, but in no event later than ten (10) calendar days after delivery of the Enforcement Notice or at such other date that may be agreed to by the parties after good faith negotiations.  Except as set forth in this Paragraph 10 or otherwise ordered by the Court prior to the expiration of the Enforcement Notice Period, after the Enforcement Notice Period, the Debtors shall be deemed to have waived their right to and shall not be entitled to seek any relief, including, without limitation, under Bankruptcy

34

Code section 105, to the extent such relief would in any way impair or restrict the rights and remedies of the Prepetition Secured Parties under this Interim Order.

11.    <u>Preservation of Rights Granted Under this Interim Order</u>.

(a)    Subject to the Carve-Out and any Prepetition Permitted Liens, other than as set forth in this Interim Order, no claim or lien having a priority senior to or *pari passu* with those granted to any of the Prepetition Secured Parties by this Interim Order shall be granted or permitted while any of the Prepetition Secured Obligations remain outstanding.  Except as expressly provided in this Interim Order, each of the Adequate Protection Liens, the Adequate Protection Claims, the Prepetition Liens or the Prepetition Secured Obligations: (i) shall not be junior or subordinated to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any Successor Cases, whether under Bankruptcy Code section 364(d) or otherwise, (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under Bankruptcy Code section 551 or otherwise, (C) any lien arising after the Petition Date including, without limitation, any lien or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors or (D) any intercompany or affiliate lien or claim; and (ii) shall not be subject to Bankruptcy Code sections 510, 549, 550 or 551 and, subject to entry of the Final Order, Bankruptcy Code section 506(c).

(b)    In the event this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, the validity and priority of any liens or claims granted to the Prepetition Secured Parties hereunder arising prior to the effective date of any such vacatur, reversal, or modification shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein, and the

35

Prepetition Secured Parties shall be entitled to the protections afforded in Bankruptcy Code section 363(m) with respect to all uses of the Prepetition Collateral (including Cash Collateral) and all Adequate Protection Obligations.

(c)      Notwithstanding any order dismissing any of these cases under Bankruptcy Code section 1112 or otherwise, (x) the Adequate Protection Liens, the Adequate Protection Claims and the other administrative rights and benefits granted pursuant to this Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all Adequate Protection Obligations and Prepetition Secured Obligations are indefeasibly paid in full, in cash; (y) all Adequate Protection Liens, Adequate Protection Claims and other rights and benefits granted pursuant to this Interim Order shall remain binding on all parties in interest; and (z) this Court shall retain jurisdiction for the purposes of enforcing the rights, claims, liens, and security interests referred to in this Paragraph to the extent allowed by applicable law.

(d)      Except as expressly provided in this Interim Order,  the Adequate Protection Liens, the Adequate Protection Claims, and all other rights and remedies of the Prepetition Secured Parties granted by this Interim Order shall survive, shall maintain their priority as provided in this Interim Order, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of these Chapter 11 Cases to a Successor Case, dismissing any of the cases, terminating the joint administration of the cases, or (ii) the entry of an order confirming a plan in any of these cases.  The terms and provisions of this Interim Order shall continue in these Chapter 11 Cases, in any Successor Cases, or if these cases are no longer jointly administered.  The Adequate Protection Liens and the Adequate Protection Claims and all other rights and remedies of the Prepetition Secured Parties granted by this Interim Order shall continue in full force and effect until the effective date of the Plan (or later, as and to the extent set forth in the Plan).

36

12.    <u>Professional Fees</u>.

(a)    The Debtors are authorized and directed to pay, without further Court order, the reasonable and documented fees and expenses whether incurred before or after the Petition Date of professionals retained by the Required Consenting Lenders (the "<u>Required Consenting Lender Professionals</u>"), including but not limited to:  (i) Akin Gump Strauss Hauer & Feld LLP; (ii) Pashman, Stein, Walder & Hayden P.C.; and (iii) any other professional retained by the Required Consenting Lenders.   The Required Consenting Lender Professionals shall not be required to file motions or applications with respect to the fees and expenses incurred by the Required Consenting Lender Professionals (the "<u>Required Consenting Lender Professionals Fees</u>"); *provided*, *however* that any time such professionals seek payment of fees and expenses from the Debtors, each professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine) to counsel to the Debtors, the U.S. Trustee and counsel to any Committee (collectively, the "<u>Fee Notice Parties</u>").   Any objections raised by any Fee Notice Party with respect to such invoices must (x) be in writing (y) state with particularity the grounds for such objection and (z) be submitted to the affected professional(s) within seven (7) calendar days after delivery of such invoices to the Fee Notice Parties (such seven (7) day calendar period, the "<u>Fee Objection Period</u>").   If no objection to payment of the requested Required Consenting Lender Professional Fees and expenses is made, in writing, by any of the Fee Notice Parties prior to the expiration of the Fee Objection Period, then

37

such invoice shall be promptly paid, without further order of, or application to, the Court or notice to any other party, and, in any case, within seven (7) calendar days following the expiration of the Fee Objection Period and shall not be subject to any further review, challenge, or disgorgement. If within the Fee Objection Period, a Fee Notice Party sends to the affected professional a written objection to such invoice, then only the disputed portion of such Required Consenting Lender Professional Fees shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court, and any undisputed portion shall be paid within seven (7) calendar days following the expiration of the Fee Objection Period.

(b)     Notwithstanding anything contained in this Interim Order to the contrary, any and all payments of the Required Consenting Lenders' Professional Fees pursuant to this Interim Order, whether incurred prior to, on or after the Petition Date, shall be non-refundable and irrevocable, are hereby approved (and to the extent paid prior to entry of the Interim Order, ratified in full), and shall not be subject to any challenge, objection, defense, claim or cause of action of any kind or nature whatsoever, including, without limitation, avoidance (whether under chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, subordination (whether equitable, contractual, or otherwise), reclassification, disgorgement, disallowance, impairment, marshaling, surcharge or recovery or any other cause of action, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, by any person or entity; provided, however, any such payments may be subject to recharacterization as principal.

(c)     In addition, the Debtors will indemnify the Prepetition Secured Parties, the Required Consenting Lender's Professionals and their respective affiliates, successors and assigns

38

and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing, and hold them harmless from and against any and all losses, claims, damages, costs, expenses (including, but not limited to reasonable and documented legal fees and expenses) and liabilities arising out of, in connection with, or by reason of the transactions contemplated hereby, including in respect of the granting of Adequate Protection Liens, Adequate Protection Claims, and all documents related to and all transactions contemplated by the foregoing.

13.    <u>Limitation on Use of Cash Collateral</u>.  Subject to Paragraph 14 hereof, none of the Adequate Protection Collateral, Prepetition Collateral (including Cash Collateral) or the Carve-Out may be used:  (i) to investigate (except as expressly provided herein), initiate, prosecute, join or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense or other litigation of any type (A) against any of the Prepetition Secured Parties and each of their respective affiliates, officers, directors, employees, agents, representatives, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, any so-called "lender liability" claims and causes of action, or seeking relief that would impair the rights and remedies of the Prepetition Secured Parties under this Interim Order or the Prepetition Credit Documents, as applicable, to the extent permitted or provided hereunder, including, without limitation, for the payment of any services rendered by any Retained Professional in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration or similar relief that would impair the ability of any of the Prepetition Secured Parties to recover on the Prepetition Collateral,

or seeking affirmative relief against any of the Prepetition Secured Parties related to the Prepetition Secured Obligations, as applicable, (B) seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the Prepetition Liens or the Prepetition Secured Obligations or (C) for monetary, injunctive or other affirmative relief against any of the Prepetition Secured Parties that would impair the ability of any of the Prepetition Secured Parties to assert or enforce any lien, claim, right or security interest or to realize or recover on the Prepetition Secured Obligations to the extent permitted or provided hereunder; (ii) for objecting to or challenging in any way the legality, validity, priority, perfection or enforceability of the claims, liens or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Secured Obligations; (iii) for asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to the Prepetition Liens or the Prepetition Secured Obligations; or (iv) for prosecuting an objection to, contesting in any manner or raising any defenses to, the validity, extent, amount, perfection, priority or enforceability of any of the Prepetition Liens, Prepetition Secured Obligations or any other rights or interests of any of the Prepetition Secured Parties related to the Prepetition Secured Obligations; *provided* that up to $50,000 of the Prepetition Collateral, including Cash Collateral (the "Committee Investigation Budget"), may be used by a Committee appointed in the Debtors' Chapter 11 Cases to investigate the claims and liens of the Prepetition Secured Parties, solely with respect to the Prepetition Secured Obligations and Prepetition Collateral within the Challenge Period (as defined below).

14.     Effect of Stipulations on Third Parties.

(a)     The acknowledgments, stipulations, admissions, waivers and releases contained herein shall be binding upon the Debtors, their estates, and any successor or assigns

40

thereto upon entry of this Interim Order and the Debtors shall be deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Petition Date.

(b)      The acknowledgments, stipulations, admissions, waivers and releases contained in this Interim Order shall also be binding upon all other parties in interest, including, but not limited to, any Committee, or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "Trustee") and each of their respective successors and assigns, in all circumstances and for all purposes, unless (i) such party, having obtained the requisite standing, timely and properly commences and serves an adversary proceeding or contested matter challenging the validity, perfection, priority, extent, or enforceability of the Prepetition Liens or the Prepetition Secured Obligations, or otherwise asserting or prosecuting any other claims, counterclaims or causes of action, objections, contests, or defenses (each, a "Challenge") against the Prepetition Secured Parties in connection with any matter related to the Prepetition Credit Facilities, the Prepetition Collateral, the Prepetition Liens, or the Prepetition Secured Obligations by the date that is no later than the earlier of (i) seventy-five (75) calendar days after entry of this Interim Order or (ii) subject to entry of a Final Order, the commencement of a hearing on the confirmation of the Debtors' plan; in each case, subject to further written extension (which writing may be in the form of e-mail by counsel) by the Term Loan Secured Party or the Secured Notes Collateral Agents (at the direction of the Required Consenting Lenders), as the case may be (the "Challenge Period"); *provided* that in the event that, prior to the expiration of the Challenge Period, (x) any of these cases is converted to a Successor Case or (y) a chapter 11 trustee is appointed, then, in each such case, the Challenge Period shall be extended for a period of thirty (30) days solely with respect to any Trustee, commencing on the occurrence of either of the events described in the foregoing clauses (x) and (y); and (ii) an order is entered by a court of competent

41

jurisdiction and becomes final and non-appealable in favor of the party asserting any Challenge sustaining any Challenge in such duly filed adversary proceeding or contested matters.

(c)    If no such adversary proceeding or contested matter is filed prior to the expiration of the Challenge Period, without further order of this Court: (i) the Prepetition Secured Obligations shall constitute allowed claims, not subject to any Challenge (whether characterized as a counterclaim, setoff, subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by Bankruptcy Code section 101(5)), impairment, subordination (whether equitable, contractual or otherwise), or other challenge of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law), for all purposes in the chapter 11 cases and any Successor Cases, if any; (ii) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, non-avoidable liens, not subject to setoff, subordination, defense, avoidance, impairment, disallowance, recharacterization, reduction, recoupment, or recovery; and (iii) the Prepetition Secured Obligations, the Prepetition Liens, and the Prepetition Secured Parties (in their capacities as such) shall not be subject to any other or further Challenge and all parties in interest (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period) shall be forever enjoined and barred from seeking to exercise the rights of the Debtors' estates or taking any such action.

(d)    If an adversary proceeding or contested matter is timely filed by a party that has been granted standing prior to the expiration of the Challenge Period, (i) the stipulations and admissions contained in this Interim Order shall nonetheless remain binding and preclusive on all parties in interest, except for the party that has timely filed such adversary proceeding and solely

42

as to the stipulations or admissions that are specifically and expressly challenged in such adversary proceeding or contested matter, *provided* that, for the avoidance of doubt, proceeds recovered as a result of or in connection with a successful Challenge shall be distributed in accordance with applicable law; and (ii) any Challenge not brought in such adversary proceeding or contested matter shall be forever waived; *provided* that, if and to the extent any Challenge to a particular stipulation or admission is withdrawn, denied or overruled by entry of an order by a court of competent jurisdiction, such order shall be binding on the Debtors' estates and all parties in interest.  For the avoidance of doubt, any chapter 7 trustee appointed or elected in these cases shall, until the expiration of the period provided herein for asserting Challenges, and thereafter for the duration of any adversary proceeding or contested matter commenced pursuant to this paragraph (whether commenced by such trustee or commenced by any other party in interest on behalf of the Debtors' estates), be deemed to be a party other than the Debtors and shall not, for purposes of such adversary proceeding or contested matter, be bound by the acknowledgements, admissions, confirmations and stipulations of the Debtors in this Interim Order to the extent Challenged in such adversary proceeding or contested matter.  For the avoidance of doubt, no professional fees or expenses of any party shall be funded by the Debtors' estates in connection with any Challenge and any fees incurred in respect thereof shall not be required to be paid from Adequate Protection Collateral or Prepetition Collateral (including Cash Collateral) in order for the Debtors to confirm a chapter 11 plan and have such plan go effective or consummate any sale of assets under Bankruptcy Code section 363.

(e)     Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including any Committee, standing or authority to pursue any Challenge or any claims or causes of action belonging to the Debtors or their estates.  Notwithstanding the

43

foregoing, the filing of a motion seeking standing to file a Challenge before the end of the Challenge Period, which motion attaches a complaint with a proposed Challenge, shall, solely to the extent such standing motion is granted by the Court, extend the Challenge Period solely with respect to that party and solely as to the Challenges specifically identified in the complaint attached to such standing motion until the earlier of (i) the date that such standing motion is withdrawn, (ii) the date the Court enters an order denying the standing motion, or (iii) two (2) business days after the date the Court enters an order approving the standing motion, or such other time period ordered by the Court in an order approving the standing motion.

15.    <u>Insurance</u>.  At all times the Debtors shall maintain casualty and loss insurance coverage of the Prepetition Collateral on substantially the same terms as that maintained prior to the Petition Date.

16.    <u>Credit Bidding</u>.  Subject to entry of the Final Order, in the sale or other disposition of any assets of the Debtors, whether pursuant to Bankruptcy Code section 363, pursuant to a plan of reorganization or liquidation, or by a chapter 11 or chapter 7 trustee, subject to Bankruptcy Code section 363(k), the Term Loan Secured Party or the Secured Notes Collateral Agents (on behalf, and at the direction, of the Required Consenting Lenders), as the case may be, shall have the unqualified and unconditional right to credit bid: (x) up to the full amount of the Prepetition Term Loan Secured Obligations or the Prepetition Secured Note Obligations, as the case may be, and (y) the Adequate Protection Obligations with respect to the Prepetition Secured Parties. Each Prepetition Secured Party shall automatically be deemed a "qualified bidder" with respect to any such disposition of assets of the Debtors.  The Term Loan Secured Party and the Secured Notes Collateral Agents (on behalf, and at the direction, of the Required Consenting Lenders), shall have

44

the absolute right to assign, sell, or otherwise dispose of its right to credit bid to any acquisition entity or joint venture formed in connection with such credit bid.

17.     <u>No Waiver by Failure to Seek Relief</u>.  The failure of the Debtors or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the Prepetition Credit Facilities, or applicable law shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise.

18.     <u>Limitation on Charging Expenses</u>. Subject to entry of the Final Order, except to the extent of the Carve-Out, no costs or expenses of administration of these Chapter 11 Cases or any Successor Cases at any time, including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the Secured Notes Collateral Agents or the Prepetition Secured Parties, respectively, upon the Prepetition Collateral, shall be charged against or recovered from the Prepetition Collateral, whether pursuant to Bankruptcy Code section 506(c), any other legal or equitable doctrine (including unjust enrichment) or otherwise, without the prior written consent of the Required Consenting Lenders, and no such consent shall be implied, directly or indirectly, from anything contained in this Interim Order (including, without limitation, consent to the Carve-Out or the approval of any budget hereunder) or from any other action, inaction, or acquiescence by any of the Prepetition Secured Parties.

19.     <u>No Marshaling; Section 552(b) Waiver</u>. Subject to entry of the Final Order, in no event shall the Secured Notes Collateral Agents or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Adequate Protection Collateral, Adequate Protection Obligations, Prepetition Collateral or the Prepetition Secured Obligations, and all proceeds shall be received and applied in accordance with the

45

Prepetition Credit Facilities, as the case may be. Subject to entry of the Final Order, each of the Prepetition Secured Parties shall be entitled to all of the rights and benefits of Bankruptcy Code section 552(b), and in no event shall the "equities of the case" exception in Bankruptcy Code section 552(b) apply to the Prepetition Secured Parties or the Prepetition Collateral.

20.    <u>Binding Effect; Successors and Assigns</u>.  The provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these cases, including, without limitation, the Prepetition Secured Parties, any Committee, the Debtors, and their respective successors and assigns (including any Trustee, an examiner appointed pursuant to Bankruptcy Code section 1104, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of their estates) and shall inure to the benefit of the Prepetition Secured Parties.

21.    <u>Limitation of Liability</u>.  In permitting the use of their Cash Collateral, or exercising any rights or remedies as and when permitted pursuant to this Interim Order, the Prepetition Secured Parties shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or their business, nor shall they owe any fiduciary duty to any of the Debtors, their creditors or estates, or constitute or be deemed to constitute a joint venture or partnership with any of the Debtors.  Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in Bankruptcy Code section 101(2)).

22.    <u>Master Proofs of Claim</u>.  None of the Prepetition Secured Parties shall be required to file a proof of claim in any of these Chapter 11 Cases or Successor Cases, as applicable, and the

IMPAC 11525542v.9

Debtors' Stipulations set forth herein shall be deemed to constitute a timely filed proof of claim (but as to which the Debtors may not object), with respect to the Prepetition Secured Obligations and the Adequate Protection Obligations. However, notwithstanding the foregoing or anything to the contrary in the Motion or this Interim Order, the Secured Notes Collateral Agents are authorized, but not directed or required, to file one master proof of claim on behalf of the Secured Noteholders on account of any and all claims arising under the Prepetition Credit Facilities or hereunder (a "Master Proof of Claim"). For administrative convenience, any such Master Proof of Claim may be filed in the case of Debtor CalAmp, and such Master Proof of Claim shall be deemed to have been filed and asserted against all Debtors. For the avoidance of doubt, the provisions set forth in this paragraph and any Master Proof of Claim filed pursuant to the terms hereof are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party in interest, including, without limitation, the numerosity requirements set forth in Bankruptcy Code section 1126. The Secured Notes Collateral Agents shall not be required to attach any instruments, agreements, or other documents evidencing the obligations owing by each of the Debtors to the Secured Noteholders, which instruments, agreements, or other documents will be provided upon written request to counsel to the Secured Notes Collateral Agents.

23. <u>Automatic Stay Modified</u>. The automatic stay imposed by Bankruptcy Code section 362(i) is hereby vacated and modified, without application to or further order of this Court, to permit: (a) the Debtors to grant the Adequate Protection Liens and Adequate Protection Claims and to perform such acts as the Prepetition Secured Parties may request to assure the perfection and priority of the Adequate Protection Liens; (b) the Debtors to incur all liabilities and obligations to the Prepetition Secured Parties, including all Adequate Protection Claims, the Adequate

47

Protection Payments and any other Adequate Protection Obligations, as contemplated under this Interim Order; (c) the Debtors to pay all amounts required under this Interim Order; (d) the Prepetition Secured Parties to retain and apply payments made in accordance with the terms of this Interim Order and the Prepetition Credit Documents; (e) subject in all respects to paragraph 10 of this Interim Order, the applicable Prepetition Secured Parties to exercise, upon the occurrence of any Termination Event, all rights and remedies provided for in this Interim Order or applicable law; (f) the Debtors to perform under this Interim Order and to take any and all other actions that may be necessary, required or desirable for the performance by the Debtors under this Interim Order and the implementation of the transactions contemplated hereunder; and (g) the implementation of all of the terms, rights, benefits, privileges, remedies and provisions of this Interim Order.

24.     No Third-Party Rights.  Except as explicitly provided for in this Interim Order, any rights and obligations granted in this Interim Order inure solely for the benefit of the Prepetition Secured Parties, and no third party shall have any rights hereunder.

25.     Necessary Action.  The Debtors are authorized to take any and all actions and to make, execute and deliver any and all instruments as may be reasonably necessary to implement the terms of this Interim Order and the transactions contemplated hereby.

26.     Effectiveness.  This Interim Order shall constitute findings of fact and conclusions of law and shall be effective as of the Petition Date.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, this Interim Order shall

48

be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Interim Order.

27. <u>Bankruptcy Rules</u>. The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

28. <u>Final Hearing</u>. The Final Hearing shall be held on [_____], **2024, at [_____], prevailing Eastern Time**; provided that the Final Hearing may be adjourned or otherwise postponed upon the Debtors filing a notice of such adjournment if the Required Consenting Lenders so consent. The Debtors shall provide notice of the Final Hearing and the proposed Final Order in accordance with the Local Rules to all parties having been given notice of the Hearing and to any other party entitled to notice pursuant to Local Rule 9013-(m) and Bankruptcy Rule 2002. Any objections or responses to entry of the Final Order shall be filed on or before **4:00 p.m., prevailing Eastern Time, on [_____], 2024** and shall be served upon: (i) proposed counsel to the Debtors, Potter Anderson & Corroon LLP, 1313 N. Market Street, 6th Fl., Wilmington, DE 19801, Attn: L. Katherine Good (kgood@potteranderson.com); Aaron H. Stulman (astulman@potteranderson.com) and Gregory J. Flasser (gflasser@potteranderson.com); (iii) counsel to the Required Consenting Lenders, (a) Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attn: Michael Stamer (mstamer@akingump.com) and Jason Rubin (jrubin@akingump.com), and (b) Pashman, Stein, Walder & Hayden P.C., 1007 N. Orange Street, 4th Floor #183, Wilmington, DE 19801, Attn: Joseph C. Barsalona II (jbarsalona@pashmanstein.com), John W. Weiss (jweiss@pashmanstein.com), and Richard C. Solow (rsolow@pashmanstein.com); (v) counsel to the Committee, if any; and (vi) the Office of the United States Trustee, J. Caleb Boggs Federal

49

Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn:  Rosa Sierra-

Fox (rosa.sierra-fox@usdoj.gov).

29.    <u>Retention of Jurisdiction</u>.  The Court shall retain jurisdiction to resolve any and all

disputes arising under or related to the provisions of this Interim Order, and to enforce all of the

conditions of this Interim Order.

50

## **Exhibit 1**

**Initial Budget**

**CalAmp 9 Week Cash Flow Forecast**

*$s in 000s*

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **Illustrative** | | | | | | | | | |
| | | **June 3rd Filing Date** | | | | | | | | | |
| *Week #* | **1** | **2** | **3** | **4** | **5** | **6** | **7** | **8** | **9** | | **Total** |
| *Week Ending* | **6/2/2024** | **6/9/2024** | **6/16/2024** | **6/23/2024** | **6/30/2024** | **7/7/2024** | **7/14/2024** | **7/21/2024** | **7/28/2024** | | **9 Week** |
| Total Receipts | $ 5,657 | $ 1,758 | $ 2,510 | $ 5,029 | $ 6,684 | $ 3,279 | $ 3,935 | $ 2,142 | $ 7,042 | | $ 38,035 |
| Total Operating Disbursements | (7,053) | (4,141) | (3,751) | (6,428) | (7,134) | (6,203) | (4,550) | (6,128) | (4,453) | | (49,840) |
| **Operating Cash Flow** | $ (1,396) | $ (2,382) | $ (1,241) | $ (1,398) | $ (451) | $ (2,924) | $ (616) | $ (3,986) | $ 2,590 | | $ (11,805) |
| Total Non - Operating & Restructuring Disbursements | (612) | (248) | (734) | (418) | (436) | (248) | (732) | (233) | (6,060) | | $ (9,719) |
| **Net Cash Flow** | $ (2,008) | $ (2,630) | $ (1,975) | $ (1,816) | $ (886) | $ (3,171) | $ (1,348) | $ (4,219) | $ (3,470) | | $ (21,524) |
| **Beg. Consolidated Cash** | $ 57,156 | $ 55,149 | $ 52,519 | $ 50,543 | $ 48,727 | $ 47,841 | $ 44,669 | $ 43,321 | $ 39,103 | | $ 57,156 |
| (+)(-) Change in Cash | (2,008) | (2,630) | (1,975) | (1,816) | (886) | (3,171) | (1,348) | (4,219) | (3,470) | | (21,524) |
| **End  Consolidated Cash** | $ 55,149 | $ 52,519 | $ 50,543 | $ 48,727 | $ 47,841 | $ 44,669 | $ 43,321 | $ 39,103 | $ 35,632 | | $ 35,632 |